In the Matter of ERIE LACKAWANNA
RAILWAY CO., Debtor,

Appeal of NON–CONTRACT RETIREES.

No. 76–2559.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 14, 1976.

Decided Jan. 18, 1977.

Rehearing and Rehearing En Banc
Denied March 11, 1977.

Paul W. Walter, Charles T. Riehl III, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, for appellant.

Harry G. Silleck, Jr., Mudge, Rose, Guthrie & Alexander, New York City, Alan R. Lepene, Thompson, Hine & Flory, Cleveland, Ohio, for appellee.

Before PHILLIPS, Chief Judge, and WEICK and LIVELY, Circuit Judges.

WEICK, Circuit Judge.

This appeal involves the claims of 1,125 non-contract white-collar retirees of the Debtor, Erie Lackawanna Railway Co. (EL), most of whom retired prior to the filing of the Petition for Reorganization in the Dis-

trict Court, and all of whom retired before the date of the transfer of EL's assets to the Consolidated Rail Corp. (Conrail). The retirees contend that the Trustees of the estate of EL are obligated to continue indefinitely to pay the premiums on their group life insurance.

In Order No. 573 of the United States District Court for the Northern District of Ohio, the Honorable Robert B. Krupansky presiding (Reorganization Court), the Judge determined that the retirees' claims against the Debtor's estate for payment of group life insurance premiums in the future were not entitled to priority as an administrative expense. The retirees appealed. We affirm.

As a result of this determination such payments could not be made through the mechanism of a Government loan pursuant to Section 211(h) of the Regional Rail Reorganization Act of 1973 (Rail Act), 45 U.S.C. § 701, et seq., as amended by Section 606 of the Railroad Revitalization and Regulatory Reform Act of 1976 (RRRRA or 4R Act), 45 U.S.C. § 721(h) (Supp. 2, 1976), and by section 203 of the Rail Transportation Improvement Act (RTIA), 45 U.S.C. § 721(h) (Supp. 4, 1976), which loan would have been ultimately repayable by the debtor's estate.

The group insurance policy providing life insurance at the expense of EL, in whole or in part, for employees of EL has been in effect since 1970 with the Travelers Insurance Co. EL reserved the right to terminate the entire plan. 1,110 of the non-contract retirees involved in this dispute have an average coverage of about $3,400. For the other members of the group the coverage amounts to as high as $10,000 or an amount equal to the last annual salary, whichever was greater. Further, the retirees have the option of continuing during their retirement their optional contributory coverage in an amount equal to twice their last annual salary.

The non-contract employees are those whose employment was not governed by a collective bargaining agreement between EL and a union. All the non-contract employees involved in this dispute retired prior to the transfer of the operating assets of EL to Conrail on April 1, 1976. An undetermined number of these employees retired before the filing of the petition for reorganization of the railroad in 1972. Those non-contract employees of the estate who were transferred to Conrail are covered by a new group policy instituted by Conrail. Further, the present dispute does not involve the Debtor's bargaining unit retirees, because their group life insurance plans became an obligation of Conrail pursuant to the Final System Plan. Also, the present employees of the Debtor's estate continue to have group life insurance premiums paid by the Trustees of the estate.

On June 26, 1972 EL filed a petition seeking to reorganize pursuant to § 77 of the Bankruptcy Act, 11 U.S.C. § 205, and two Trustees were appointed by the Court. At that time Judge Krupansky of the Reorganization Court entered Order No. 1 which stated in pertinent part:

4. The Debtor is authorized in its discretion, from time to time until the further order of this Court, out of funds now or hereafter in its possession, to pay all or any of the following, in whole or in part, without limiting the generality thereof:

. . .. H. All payments due from time to time on established retirement and compensation arrangements, and all group insurance carried in whole or in part by the Debtor;

Pursuant to the discretion allowed by Order No. 1, the EL Trustees paid the premiums under the group insurance plan during the period that they operated the Debtor's railroad.

On January 2, 1974, the Rail Act became effective, supplementing § 77 of the Bankruptcy Act. The Rail Act was enacted in an effort to solve a rail transportation crisis caused by the reorganization of eight major railroads, one of which was EL. The Act established a new Government corporation, the United States Railway Association (USRA), which was directed to prepare a Final System Plan for transferring selected rail properties by the railroads in reorganization to a private, state-incorporated cor-

poration, Conrail, in return for securities of Conrail, plus a limited amount of federally guaranteed obligations of USRA and other benefits accruing to the railroads under the transfer. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 108–117, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

As originally enacted, the Rail Act did not provide for federally funded loans to railroads in reorganization to meet their obligations. In February, 1976, the Rail Act was amended by Section 606 of the RRRRA to create such a loan program under § 211(h). The USRA was authorized to make loans to Conrail, which could act as collection and payment agent of the estate. Section 211(h) provided six categories of pre-conveyance claims for which loans could be made, but these categories did not include amounts relating to life insurance carried by an estate for employees or retirees, although it did include amounts to fund pension benefits. Section 211(h) also gave Conrail the right to reimbursement against the Debtor's estate, which right was given a priority over other administrative expenses except trustees' certificates. Section 211(h) further provided that USRA may forgive Conrail for reimbursement of the indebtedness incurred on behalf of § 211(h)(1) loans, and USRA, after the forgiveness, would stand in place of Conrail with respect to reimbursement by the estate of the railroad in reorganization. Several courts have further described the workings of § 211(h). *See In re Ann Arbor R.R.,* 414 F.Supp. 812 (E.D.Mich.1976); *In Re Cent. R.R. of N.J.,* 412 F.Supp. 927 (D.N.J.1976); *In Re Penn Cent. Transp. Co.,* 411 F.Supp. 1079 (E.D.Pa.1976).

The conveyance of properties to Conrail in the present case occurred on April 1, 1976. Prior to the transfer EL had about 11,000 employees. Since that date fewer than 40 employees remain as employees of the Trustees. In the takeover of assets of EL by Conrail group life insurance premiums of all employees and retirees who were covered by collective bargaining agreements were assumed by Conrail, but those of the non-contract retirees were not. On April 23, 1976, the EL Trustees petitioned the Reorganization Court informing the Court that they intended to petition the Special Court, established under the Rail Act, to correct the omission from the conveyance documents of all rights and obligations with respect to the life insurance and medical coverage programs of the EL estate. The Trustees sought instructions from the Reorganization Court, in the event their petition to the Special Court was denied, as to whether the Insurance Plan should be continued or terminated as to the retirees; the Trustees also proposed that they be given authority to continue payment of the cost of the Insurance Plan on a monthly basis pending resolution of this issue.

Thereafter the EL Trustees joined the Trustees of the Penn Central Transportation Co. and the Lehigh Valley Railroad Co. in petitioning the Special Court to require Conrail to assume the obligations of those carriers under non-contributory group life insurance policies for non-contract employees. On June 24, 1976, the Special Court, Judge Henry J. Friendly presiding, determined that the obligations for premium payments of non-contract retirees did not transfer to Conrail. The Special Court, while recognizing "with regret that our conclusion may have harsh results" stated that:

> . . . we are unpersuaded that Congress intended to saddle Conrail with an obligation to maintain group life insurance for the benefit of people who had never worked for it or even to incur the onus of termination. The group life insurance plans would surely have terminated if Congress had not passed the Rail Act and provided the massive financial aid required to implement it; we see nothing inconsistent in its leaving the decision as to their future with the reorganization trustees and courts.

The EL Trustees supplemented their April petition to the Reorganization Court on July 2, 1976 requesting interim authority to pay the life insurance premiums, pending legislation to amend the Rail Act, then un-

**624**

der consideration by the House Committee on Interstate and Foreign Commerce. A hearing on the petition was held on July 20, 1976, without notice to the non-contract retirees. Mr. Harry A. Zilli, Jr., an executive officer of the EL estate, testified on direct examination that the monthly premium for the life insurance for the 1,125 retirees is about $25,000, and that it would cost the EL estate about $3.6 million to fund by a single premium annuity the employer's portion of the life insurance coverage for the retirees. Zilli testified that the Estate would not be able to bear the cost of the monthly premiums indefinitely and would not be able to pay $3.6 million as a single annuity type payment. He also stated that it would be a hardship on the retirees if the insurance policy was terminated, and that the retirees "would lose the current group rates and their costs would be increased substantially because they would have to take it out on an individual basis with the insurance company." Zilli concluded by noting that the Trustees recommended that they continue payment of the premiums until October 1, the anticipated date of enactment of the 1976 amendments to the Rail Act. The Trustees of the bond indentures, Citibank, N.A., et al., also appeared at the hearing requesting that the Reorganization Court instruct the EL Trustees to terminate any further payments on the group insurance plans because the payments were an "irretrievable borrowing from the creditors."

Following the July 20 hearing, Judge Krupansky entered Order No. 544 in which he noted that the Estate could not "sustain the irrecoverable cost of approximately $25,000 per month" to continue the insurance plans, but that payments until October 1, 1976 would be in the "public interest". He concluded:

Accordingly, the Trustees are hereby authorized to continue the premium payments on said plans to and including October 1, 1976. No premium payments shall be made thereafter. During the interim period, the Court urges the Trustees to explore other avenues that will provide alternative means for sustaining the rights of the beneficiaries of said plans.

Pursuant to this Order, the EL Trustees arranged for continuation of the group coverage for all retirees who elected to pay the full cost thereof. Testimony at a later hearing in November revealed that 868 of the 1,125 retirees elected to exercise the option.

On October 19, 1976, the Rail Transportation Improvement Act (RTIA) was enacted which, among other things, amended the Rail Act by adding to the § 211(h)(1) categories of claims for which loans could be made. Specifically, § 203 of RTIA provided for § 211(h)(1)(A)(viii) which made the following type of claim eligible for § 211(h) loans:

[A]mounts required to provide adequate funding for payment, when due, of medical and life insurance benefits for employees (whether or not their employment was governed by a collective bargaining agreement) on account of their service with a railroad in reorganization prior to the date of conveyance pursuant to section 303(b)(1) of this Act, and for individuals who retired, prior to such date of conveyance, from service with a railroad in reorganization;

Two days after RTIA was enacted, on October 21, 1976, the EL Trustees petitioned the Reorganization Court to supplement Order No. 544 by "expressly determining whether or not such claims to life insurance coverage have administration claim status". At the November 11 hearing, of which the retirees had notice and at which all counsel were present, Conrail's counsel stated that if the Court determined that the retirees' claims to coverage had administrative claim status, Conrail would seek a loan from USRA under 211(h) of the Rail Act to fund the cost of the premium, and that Conrail would seek reimbursement of the loan from the estate under § 211(h)(4), (5).

On November 17, the Reorganization Court entered Order No. 573 denying administrative claim status to the retirees'

claims. The Court noted both the Trustees' and USRA's contention that § 211(h)(1) loan funds may not be used to pay an obligation that has not either been acknowledged by the Trustees or approved by the Reorganization Court as an administrative claim against the Debtor. The Court then held that "the legislative history of the 1976 Amendments is clear that no change in this requirement is intended as it relates to insurance benefits." The Court reiterated that the estate could not sustain the costs of indefinitely continuing the group insurance plans and directed the Trustees to continue procedures whereby the costs of the group insurance plan would be borne by the retirees.

A motion for a stay of Order No. 573 was denied by the Reorganization Court on November 26, 1976. On that same day, counsel for the retirees and Trustees agreed to file with a Judge of this Court, a motion for a stay pending disposition of the appeal. The Judge granted the motion agreed to by counsel and directed the Trustees to pay the insurance premiums of the non-contract retirees pending the disposition of this appeal. Pursuant to a subsequent stipulation among the parties dated November 30, 1976 (then unapproved by this Court), the Debtor's estate was indemnified for the additional cost of funding the insurance program through December 31, 1976. On December 14, 1976, following oral argument of the appeal, all parties were advised by the Clerk of this Court that despite any stipulation or modification by the parties, the stay order of November 26, 1976 was not modified, and remained "in full force and effect pending the disposition of this matter by this Court". On January 5, 1977, this Court approved the November 30, 1976 stipulation in view of letters received from counsel for the EL Trustees and the Indenture Trustees. The December 17, 1976 letter from counsel for the EL Trustees informed this Court that:

The Insurance Company has agreed that in the event the appeal is determined favorably to the Retirees prior to January 31, 1977 coverage for all retirees will have remained effective.

## I

The initial question presented by this appeal is whether the claims of the non-contract retirees under the EL group insurance plan constitute enforceable contract rights. Only if they constitute valid contract rights is it then necessary that this Court consider whether the claims have priority as administrative claims under the Rail Act as amended.

It is our opinion that these claims constitute valid contract rights not only under federal law but also under the law of Ohio where the group insurance policy was issued and delivered.

Two Ohio cases which establish the law of Ohio are: *Cantor v. Berkshire Life Ins. Co.,* 171 Ohio St. 405, 171 N.E.2d 518 (1960) and *Sheehy v. Seilon, Inc.,* 10 Ohio St.2d 242, 227 N.E.2d 229 (1967). The *Cantor* case involved a contract between a life insurance agent and the Berkshire Life Insurance Co. establishing a noncontributory retirement plan. Shortly after the agent's retirement, Berkshire attempted to cancel its contract under a clause whereby the employer reserved the right to terminate the contract, the effect of which cancellation would be to reduce the agent's retirement benefits. It was undisputed that the agent had satisfied all the necessary conditions entitling him to retirement rights. The Court noted that a consideration flows to the employer under a retirement program "in the form of a more stable and a more contented labor force"; and that such a program gives rise to contractual rights enforceable by the employee who has complied with all the conditions of the plan whether the plan is contributory or noncontributory, and despite the presence of a termination clause in the contract. The Syllabus which is the law of the case in Ohio, stated:

Where an employee has complied with all the conditions of his employment contract relating to retirement benefits and has reached the retirement age specified in the contract, his retirement rights become vested, and an employer cannot, in the absence of one of the specified causes

set forth in the contract for the divestiture of retirement benefits, divest him of such right by the exercise of a provision in the contract allowing termination thereof without cause.

In the later case of *Sheehy v. Seilon, Inc., supra,* three retired salaried employees filed a class suit to require Seilon, Inc. to continue their group life, medical, surgical and hospital coverage. The Ohio Supreme Court affirmed the decisions of the lower courts which found that:

> [T]he employer, despite the considerable cost, became obligated to continue the insurance coverage to the eligible employees upon and after their retirement, and that through the inducements and actions of the employer these employees, upon retirement, acquired a vested right to the continuance by the employer of the insurance coverage. *Id.* at 243, 227 N.E.2d at 230.

The Court also noted that the principles announced in *Cantor v. Berkshire Life Ins. Co., supra,* were applicable to the *Sheehy* case, stating:

> The *Cantor case* stands for the general proposition that, where an employee has complied with the conditions of his contract of employment, benefits have been promised and conferred on him by his employer as an inducement for the continuance of his service to the employer, and such employee reaches the specified retirement age, he acquires, by the promise and agreement of his employer, a vested right to those benefits, and, in the absence of good and sufficient causes for forfeiture, he may not be deprived thereof, notwithstanding a proviso in the contract of employment to the contrary.

*See also* Annot., 46 A.L.R.3d 464, § 4(a) (1972).

We must next determine whether EL has a reserved power to terminate the Plan.

The booklet issued by EL which describes the Group Life Insurance and Comprehensive Medical Expense Plan states at 14, 15:

> All insurance terminates when your employment terminates except retirement . . . The company reserves the right to terminate the plan.

The booklet further states at page 1 that "the final interpretation of any specific provision is governed" by the master policies issued by the Travelers Insurance Co. The Policy states at 17.1 that when an employee becomes a "Retired Employee," "his employment may, for the purposes of the insurance hereunder, be deemed to continue until terminated by the Employer." The Policy further provides at 21.1 that:

> This policy may be modified from time to time by agreement of the Company and the Employer without the consent of Employees covered hereunder, provided that no change in the provisions of this policy shall reduce the amount of any benefit to which an Employee shall be entitled on account of loss occurring prior to the effective date of such change.

While we agree with the Trustees' contention that the above provisions amount to a reserved power of EL to terminate the Plan, we also note that under Ohio law an employer may not deprive retired employees of vested rights under an insurance plan, even pursuant to a reserved power to terminate the plan, absent "good and sufficient cause for forfeiture." *Sheehy v. Seilon, Inc., supra.* The EL Trustees and Indenture Trustees contend that the Debtor's bankruptcy constitutes such "good and sufficient cause for forfeiture" of the retirees' rights under the group insurance plan. Unfortunately, Ohio law offers little guidance as to the meaning of "good and sufficient cause for forfeiture" and absent such guidance, we must look to the principles enunciated in *Sheehy v. Seilon, Inc., supra,* and *Cantor v. Berkshire Life Ins. Co., supra,* and to the principles of general contract law.

In the present case, the non-contract retirees devoted years of service to the railroad in expectation that their group insurance coverage would be continued during retirement. Because the Ohio cases premise the vesting of the retired employes' rights upon the employees' compliance with the terms and conditions of the particular plan or contract, we think that likewise, the

rights of the employees under the plan or contract may be divested only when the employee has acted in such a way as to negate or diminish the value of his loyal and continuous service to the employer, or to adversely affect the company's best interests. Thus, "good and sufficient cause for forfeiture" can only be occasioned by the acts of the employee. As the Court in *Cantor v. Berkshire Life Ins. Co., supra*, stated 171 Ohio St. at 410, 171 N.E.2d at 522:

> Clearly, under our economic system, an employer cannot offer a retirement system as an inducement to employment and, after an employee has accepted employment under such circumstances, withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder.

Our interpretation of "good and sufficient cause for forfeiture" is further reinforced by two well-settled principles of contract law. First, "although in bankruptcy the claimant can recover only in the manner and to the extent prescribed by statute, insolvency or bankruptcy of a party does not operate to relieve him from obligation to perform a contract". 17 Am.Jur.2d *Contracts* § 415 (1964). In *Central Trust Co. v. Chicago Auditorium*, 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811 (1916) the Supreme Court stated at 591, 36 S.Ct. at 415 that—

> . . . it must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or acts of bankruptcy, to be disabled from making performance . . .

*See also H. Muehlstein and Co. v. Hickman*, 26 F.2d 40 (8th Cir. 1928).

Second, "it is well settled that forfeitures by implication or by construction, not compelled by express requirements, are regarded with disfavor." 17 Am.Jur.2d *Contracts* § 500 (1964). As the Ohio Supreme Court stated in *Webster v. Dwelling House Insurance Co.*, 53 Ohio St. 558 at 563, 42 N.E. 546 at 547 (1895):

> A primal rule is that forfeitures are not favored either in equity or at law; in-

deed, it is declared as a universal rule that courts of equity will not lend their aid to enforce a forfeiture.

This principle is particularly well settled in the law of insurance, *see Coleman v. New Orleans Ins. Co.*, 49 Ohio St. 310, 325, 31 N.E. 279 (1892); 30 O.Jur.2d *Insurance* § 219 (1958); and of course it must also be remembered that "it is one of the best-known principles of insurance law that a policy or contract of insurance is to be construed liberally in favor of the insured or his beneficiary, and strictly construed against the insurer." *Id.* § 215.

While we recognize that the EL estate's dire financial condition may as a practical matter, preclude the estate from paying the premiums, the Debtor's bankruptcy should not affect the legal enforceability of the retirees' claims. Only the priority of the retirees' claims under the principles of bankruptcy, which issue we must next consider, may possibly operate to relieve the estate from paying the premiums.

## II

■ The next question presented by this appeal is whether RTIA *mandates* payment of the non-contract retirees' insurance coverage as an administrative expense of the EL estate. We hold that it does not.

Section 211(h)(4)(A), enacted in February, 1976, provides as follows:

> (4)(A) Each obligation of a railroad in reorganization in the region which is paid with financial assistance under paragraph (1) of this subsection shall be processed, on behalf of such railroad, by the Corporation, the National Railroad Passenger Corporation, or a profitable railroad, whichever is appropriate. An obligation of a railroad in reorganization in the region shall be paid, on behalf of such railroad, by the Corporation, the National Railroad Passenger Corporation, or a profitable railroad, whichever is appropriate, if—
>
> (i) such obligation is deemed by the Corporation, the National Railroad Passenger Corporation, or a profitable rail-

road, whichever is appropriate, to have been, on the date of conveyance of rail properties pursuant to section 303(b)(1) of this Act, the obligation of a railroad in reorganization in the region;

(ii) such obligation accrues after such date of conveyance but as a result of rail operations conducted prior to such date, and the trustees of such railroad in reorganization acknowledge that it is an obligation of such railroad; or

(iii) the district court of the United States having jurisdiction over such railroad in reorganization in the region approves such obligation as a valid administrative claim against such railroad;

to the extent that payment is required under a loan agreement with the Association under such paragraph (1).

The above language indicates that § 211(h)(1) loan funds may not be used to pay an obligation of a railroad in reorganization unless at least one of the following conditions is met:

(1) the obligation is deemed by Conrail, the National Railroad Passenger Corporation, or a profitable railroad to be an obligation of the railroad in reorganization, or (2) if, under certain conditions, the trustees of the railroad in reorganization acknowledge that it is an obligation of the railroad, or (3) the Reorganization Court approves the obligation as a valid administrative claim against the railroad.

While the legislative history of RTIA indicates that § 211(h)(1)(A)(viii) was designed to cure an oversight in the 4R Act in not including claims of non-contract retirees for payment of life insurance premiums, there is nothing in the language of RTIA or in the legislative history that eliminates the requirement that the claims for which loans are available must still meet one of the conditions of § 211(h)(4)(A) before a borrowing may be made by Conrail.

The legislative history of RTIA reveals that the Senate bill, S.3131, did not include a provision including insurance benefits as eligible administrative claims. Rather, the

House bill, H.R. 14932, was the one followed by the Conference substitute, by amending § 211(h) of the Rail Act to permit Conrail to borrow amounts required to provide funding for payment of insurance benefits for all employees. The Report of the House Committee on Interstate and Foreign Commerce on H.R. 14932, H.R.Rep.No.94–1479, 94th Cong., 2d Sess. 15 (1976) states:

The reported bill also expands the types of claims eligible for section 211(h) loans. It adds (1) . . .; (2) . .; and (3) amounts required for adequate funding for payment of medical and life insurance benefits for contract, non-contract and retired employees on account of service prior to date of conveyance with a railroad in reorganization. The Committee believes that these claims come within the original purpose for which these loans are designated.

There is little doubt that Congress intended to grant a special status to non-contract retirees with claims for life insurance coverage, but that special status resulted only in a grant of *eligibility* for § 211(h) loans, not in entitlement to automatic loans. In interpreting § 211(h)(1), the Court in *In Re Cent. R.R. of N.J.*, 412 F.Supp. 927 (D.N.J.1976), stated at 932:

The obvious legislative intent was to have as few obligations as possible paid with USRA loaned money. The paragraph, however, does *not* mandate the payment of such obligations without the consent of the bankrupt railroad.

The following exchange on the floor of the United States Senate on September 30, 1976 between Senator Case and Senator Pastore, one of the managers of the Conference Committee, serves to reinforce the fact that RTIA did not eliminate the requirement that Conrail may pay certain claims through a loan from USRA only if one of the conditions set forth in § 211(h)(4)(A) is satisfied. The exchange is as follows:

Mr. CASE. Mr. President, I would like to ask the Senator from Rhode Island to clarify one of the provisions of the conference report.

In particular I am concerned about the status of the health and life insurance benefits of noncontract retirees. In passing the 4R Act, Congress inadvertently omitted the necessary protection to insure that these benefits are continued. Many retired railroad employees currently find themselves in a position where they will have to assume payments of the premiums in order to continue their health and life policies. Such a situation places a heavy economic burden on a group of people forced to live within a fixed income.

I was happy to see that both the Senate and the House versions contained the provisions to protect these retired railroad employees. It is my understanding that the conferees intend that the legislation would provide for the continuation of these benefits.

Mr. PASTORE. That is correct. The conference report permits ConRail to assume the responsibility for these benefits *in the event that the bankruptcy court finds them to be an obligation of the estates.* The conferees certainly intend to protect the benefits of these retired employees by correcting the initial oversight in the 4R Act. (emphasis added) 122 Cong.Rec. S17273–74 (daily ed. Sept. 30, 1976).

When the Conference Report was presented to the House on October 1, 1976, Congressman Skubitz and Congressman Rooney, members of the Interstate and Foreign Commerce Committee, and Managers of the Conference Committee, also discussed the changes made by RTIA. Congressman Skubitz stated:

Accrued vacation pay, pension, and life insurance benefits of pre-conveyance retirees and employees are also included under 211(h). The conference report makes clear that if the court finds that the cost of these programs represents valid preconveyance obligations of [an estate], ConRail may seek a section 211(h) loan to meet the expenses. This is particularly important in relation to the pension and life insurance programs which

are being terminated by ConRail and may be ended by the estates as well. These provisions demonstrate a human concern for individuals who through no fault of their own, may be adversely affected by the continuing process of reorganization. *We do wish to make it clear, however, that we do not intend to interfere with the ordinary bankruptcy principles established within the framework of Federal law.*

We, on the Interstate and Foreign Commerce Committee, are keenly aware that the House and Senate Judiciary Committees are currently undertaking a thorough review of Federal bankruptcy law. Major reform legislation is expected in the next Congress. I am hopeful that considerable redrafting of section 77 of the Bankruptcy Act would take place, but *what we are doing in this instance in no way is intended to rewrite bankruptcy laws.*

What we are trying to do to the extent possible is to see that individuals involved will get what they are rightfully due in such areas as back vacation pay, pensions, and life insurance benefits. *We are leaving to the reorganization courts the decision on contract and bankruptcy law issues raised by these questions of protection.* Again, I should state to this that it is my understanding of 211(h) that eventually this money will be repaid once the bankrupt estates are liquidated an any litigation involving the validity of the reorganization process is resolved. [Emphasis added] 122 Cong.Rec. H12194–95 (daily ed. Oct. 1, 1976).

Congressman Rooney added:

Finally, I would like to emphasize that the conference substitute contains the House provision to fully protect pension and life insurance benefits of preconveyance retirees and makes funds available for back vacation pay. Under this legislation, if the court finds that the cost of these programs represent valid preconveyance obligations of the estates, then they may be funded through 211(h) loans.

I offered the amendment to include this provision when I was informed that the pensions for about 1,800 retirees were to cease because ConRail was not required to continue payment. I believe this could be a considerable injustice that none of us would tolerate. These programs, which were previously funded entirely by the bankrupt railroads are being terminated by ConRail, and may well be ended by the estates. I feel that this legislation protects these individuals as fully as possible under generally applicable principles of contract and bankruptcy law. *We drafted these provisions carefully. In this act we do not intend to interfere with ordinary Federal bankruptcy principles.* We simply wish, to the extent possible, to see that the individuals involved get what they are rightfully due in such areas as back vacation pay, pension and life insurance benefits. *Once these are determined to be valid claims we do not want these people to have their claims jeopardized because of a lack of available cash in the estates. We are leaving to the reorganization courts the decision on contract and bankruptcy law issues raised by these questions of protection.* [Emphasis added]

122 Cong.Rec. H12197 (daily ed. Oct. 1, 1976).

Finally, it should be noted that § 204 of RTIA which amends § 303(b)(6) of the Rail Act implies that claims for pension benefits may be entitled to automatic administrative claim status. Section 204 reads in pertinent part:

### PROTECTION OF EMPLOYEES' PENSION BENEFITS

Sec. 204. Section 303(b)(6) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 743(b)(6)) is amended by striking out the period at the end of the last sentence thereof and inserting in lieu thereof the following: ", except that in any case in which the Corporation, on or after the date of transfer or assignment as provided by this paragraph, terminates in whole or in part any such plan, the benefits under which are not guaranteed under title IV of the Employee Retirement Income Security Act of 1974, the Corporation shall guarantee the payment when due of the accrued pension benefits provided for thereunder at the time of termination. The Corporation shall be entitled to a loan pursuant to section 211(h) of this Act in an amount required for the adequate funding of accrued pension benefits under all plans transferred or assigned to the Corporation in accordance with this paragraph (whether or not terminated by the Corporation). *For purposes of such section 211(h) and not-*withstanding any other provision of Federal or State law, *amounts required for such adequate funding shall be deemed to be expenses of administration of the respective estates of the railroads in reorganization*, due and payable as of the date of transfer or assignment of the plans to the Corporation." (emphasis added)

We need not decide whether § 204 does in fact, mandate administrative claim status for pension benefit claims, but we note that if it does, the specific provision relative to pension benefits, and the absence of any specific provision relative to other claims, would further indicate that Congress did not intend to mandate administrative claim status with respect to those other claims, such as those of the retirees for insurance coverage.

### III

◼ With respect to the three alternative conditions set forth in § 211(h)(4)(A) for the use of § 211(h)(1) loan funds, it is clear that pursuant to § 211(h)(4)(A)(i), the obligation to pay the insurance premiums of the retired employees was not deemed by ConRail, the National Railroad Passenger Corp., or a profitable railroad, to be an obligation of the EL estate. Pursuant to § 211(h)(4)(A)(ii), the second alternative condition, the obligation did not "accrue" "after such date of conveyance" but rather upon the retirement of the employees, all of whom retired before the date of convey-

ance, in April 1976. Therefore, even if the EL Trustees impliedly acknowledged that the payment of premiums was an obligation by paying the premiums pursuant to the Reorganization Court's Order No. 1, this condition was not satisfied. Finally, under § 211(h)(4)(A)(iii), the Reorganization Court did not approve the obligation as a "valid administrative claim" against the estate. This Court must decide whether the Reorganization Court's determination was correct.

There is no definition in the Rail Act as amended, of what constitutes a "valid administrative claim". The legislative history as discussed, indicates that this question is to be determined in accordance with the principles of bankruptcy law. The question of priority of claims in a railroad reorganization is explained in 5 Collier, Bankruptcy, (14th Ed. 1976), § 77.21, at 569–571, which states:

> . . . the allotment of priorities generally follows equitable principles, by which it is well settled that certain liens may be chargeable with the payment of costs of administration and operating expenses . . .

> In the realm of unsecured claims, . . . costs of administration are given a preferred status, in some cases ahead of certain liens, and in all cases ahead of other unsecured claims. Included in this category are the expenses incurred in the operation of the debtor railroad during the reorganization. (Footnotes omitted.)

Footnote 20, at page 570 specifies that:

> Operating costs likewise will be given priority over those liens which may be said to have benefitted from the continued operation of the road. In both cases the railroad's mortgage bondholders and similar secured creditors may generally be said to benefit . . . . Included within the scope of operating expenses are such matters as wages . . . . .

The non-contract retirees maintain that the payment of life insurance premiums for the coverage of the retirees is akin both to wages of employees and to an unfunded pension liability, both of which have been held to be within the scope of operating expenses of a bankrupt railroad. We agree that the employees have priority claims for wages accruing or premiums becoming due during bankruptcy and prior to the transfer of assets to Conrail. However, these claims have already been paid. While the case law with respect to wages and unfunded pension liabilities dictates that the EL Trustees were obligated to pay the insurance premiums during reorganization, we think that those payments were only necessary in conducting an ongoing enterprise. After April 1, 1976, the rail operations of EL ceased and the Debtor's principal rail properties were conveyed to Conrail. Thereafter, the railroad's mortgage bondholders cannot "generally be said to benefit" from the "continued operation of the road". Therefore, the EL Trustees should not be obligated to continue further payments of premiums particularly in view of the fact that EL may not even be able to pay all of its administrative claims.

The judgment of the District Court is affirmed.