**In the Matter of ERIE LACKAWANNA RAILWAY COMPANY, Debtor.**

**Appeal of CONSOLIDATED RAIL CORPORATION.**

**No. 76–2417.**

United States Court of Appeals, Sixth Circuit.

Argued April 13, 1977.

Decided and Filed June 21, 1977.

---

**340**

Lawrence Z. Shiekman, Pepper, Hamilton & Scheetz, John G. Harkins, Jr., Philadelphia, Pa., for appellant.

Malvin E. Bank, Alan R. Lepene, Thompson, Hine & Flory, Cleveland, Ohio, for First Nat'l City Bank & U. S. Trust Co. of N.Y.

Carl C. Tucker, Frank C. Heath, William S. Paddock, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Morgan Guaranty & Clev. Trust.

Ralph A. Colbert, Squire, Sanders & Dempsey, Cleveland, Ohio, for Manufacturers Hanover Trust & Marine Midland Bank-N.Y.

Frederick G. Hoffmann, Erie Lackawanna Railway Co., Cleveland, Ohio, Harry G. Silleck, Jr., New York City, for appellee.

Before WEICK, LIVELY and ENGEL, Circuit Judges.

WEICK, Circuit Judge.

Consolidated Rail Corporation (Conrail) has appealed from Order No. 540 of the United States District Court for the Northern District of Ohio, the Honorable Robert B. Krupansky presiding (Reorganization Court), determining that Conrail is not entitled to receive compensation for serving as agent of the Trustees of the Erie Lackawanna Railway Company (EL Trustees) pursuant to § 211(h)(2) of the Regional Rail Reorganization Act of 1973 (Rail Act), as amended, 45 U.S.C. § 721(h)(2). We affirm.

As we noted in *In re Erie Lackawanna Ry., Debtor, Appeal of Non-Contract Retirees*, 548 F.2d 621, 622–23 (6th Cir. 1977), the Rail Act directed the United States Railway Association (USRA) to prepare a Final System Plan (FSP) for transferring selected rail properties by the railroads in reorganization, one of which was EL, "to a private, state-incorporated corporation, Conrail, in return for securities of Conrail, plus a limited amount of federally guaranteed obligations of USRA and other benefits accruing to the railroads under the transfer." The conveyance of a substantial part of the EL rail properties to Conrail occurred on April 1, 1976, and the EL estate then ceased common carrier service.

In order to avoid disruptions in the daily operations of the railroads while their assets were being transferred to Conrail, § 211(h) was added to the Rail Act on February 5, 1976 by Section 606 of the Railroad Revitalization and Regulatory Reform Act of 1976 (RRRRA or 4R Act), 45 U.S.C. § 721(h) (Supp. 2, 1976). Section 211(h) governs the transitional financial arrangements between Conrail and the Debtor and was designed to provide for the post-conveyance payment by Conrail of certain pre-conveyance obligations of the various bankrupt estates.

Section 211(h)(2), the subject of this appeal, provides that Conrail and the trustees of the bankrupt estates "shall attempt to negotiate" an agency agreement whereby Conrail will act as agent for the debtor estates, and will collect post-conveyance accounts receivable and will pay the pre-conveyance accounts payable. Section 211(h)(2) further provides that if Conrail and the trustees of an estate fail to reach an agreement the Reorganization Court "shall prescribe the terms of such agency agreement by order."

Section 211(h) anticipated, however, that the receivables and other specified assets would be insufficient to meet the pre-conveyance obligations of the estates, and therefore in order to provide at least a partial solution to the transitional cash flow problem, i.e. a shortfall between the cash and other current assets (including accounts receivable) of the estates and the accounts payable of the estates, § 211(h)(1) allocated loan monies to facilitate the transition.[1]

Section 211(h)(1) originally authorized USRA to make loans not to exceed $230 million in the aggregate through Conrail to the estates for payment of six specified categories of pre-conveyance obligations in order that "as few obligations as possible" would be "paid with the USRA loaned money." *In Re Central R.R. of N.J.*, 412 F.Supp. 927, 932 (D.N.J.1976). On October 19, 1976 the Rail Transportation Improvement Act (RTIA) was enacted. These amendments increased the total amount of available loan funds from $230 million to $350 million and also added four categories to the § 211(h)(1) categories of claims for which loans could be made (§ 211(h)(1)(A)(i)–(x)). *See In Re Erie Lackawanna Ry., Debtor, supra* at 624.

Section 211(h)(4)(C) gives Conrail a "direct claim, as a current expense of administration, for reimbursement" (plus interest thereon) against the debtor estate for all obligations of the estate paid by Conrail, which direct claim was given a priority in § 211(h)(5)(B) over other administrative expenses except trustees' certificates. The USRA may, in certain circumstances, forgive Conrail's indebtedness to it, and USRA, after such forgiveness, then stands in place of Conrail with respect to reimbursement from the estate of the railroad in reorganization (§ 211(h)(5)(A), (B); (6)).

Finally, § 211(h)(3) "provides another mechanism for ensuring that the use of USRA loans is kept to a minimum." *In Re Central R.R. of N.J., supra* at 933. This section authorizes USRA to petition the Reorganization Court for an order (consistent with § 77 of the Bankruptcy Act, 11 U.S.C. § 205, and with the § 211(h)(2) agency agreement) to be entered prior to conveyance identifying and applying "cash and other current assets" of the debtor estate, which cash and assets are to be made available in the post-conveyance period for the payment of the pre-conveyance obligations identified in paragraph (1). Thus, "[t]he more assets applied to such payment by the court, the less USRA loan money needed to pay such obligations as ConRail and USRA want paid." [Footnote omitted]. *In Re Central R.R. of N.J., supra.*

---

1. Conrail, however, notes in its brief to this Court that even when the § 211(h)(1) loan funds are added to the cash and other assets of the EL estate, the total amount has been inadequate to pay all of the EL estate's accounts payable. Therefore, since April 1, 1976, "the only payments which Conrail, as agent, has made in respect of Erie accounts payable have been those falling within the 'employee-related category' and those attributable to interline accounts specifically required to be paid by Section 8 of the Erie/Conrail Agency Agreement and Order No. 506." [Footnote omitted].

I

In March, 1976 USRA, Conrail, the EL Trustees, and the trustees under various mortgage indentures securing bonds issued or assumed by EL, *i.e.* Morgan Guaranty Trust Co., *et al.* (Indenture Trustees), filed statements of position with Judge Krupansky of the Reorganization Court relating to the structure and operation of the § 211(h)(2) Agency Agreement. The EL Trustees and the Indenture Trustees took the position that the Agency Agreement benefited Conrail as much as it benefited the EL estate, and that Conrail should therefore serve as agent of the EL estate without compensation.

Pursuant to the directives of § 211(h) the Reorganization Court in the present case entered Order No. 506[2] on March 31, 1976, which order, *inter alia,* approved a ten-page Agency Agreement between the EL Trustees and Conrail. Order No. 506 stated in pertinent part:

> Thus EL Trustees conclude that a minimum of $5 million should be allocated from EL's pre-conveyance cash and accounts receivable for post-conveyance requirements . . . .
>
> It should be noted, however, that the estimated $5 million includes no amount for compensation of ConRail as agent under the Agency Agreement . . . .
>
> The parties hereto have stipulated and agreed that the amount of ConRail's compensation, if any, as agent for EL as provided for in the Agency Agreement be deferred for thirty (30) days.

The Agency Agreement, which was attached to Order No. 506 as Exhibit A, stated in pertinent part:

> 9. *Compensation.* Any compensation payable to ConRail for services performed as agent under this Agreement shall be determined not later than April 30, 1976 under the supervision of the Reorganization Court.
>
> 10. *Court approval.* This Agreement shall become effective on April 1, 1976, subject to prior approval by the Reorganization Court. The Reorganization Court shall retain jurisdiction over the subject matter of this Agreement and shall determine any disputes concerning the interpretation or application of its terms and conditions. Nothing herein contained shall be deemed to create any rights, interests or obligations in or to any person not a signatory hereto.

Subsequent to the issuance of Order No. 506 the EL Trustees and Conrail conducted negotiations concerning the question of compensation to Conrail. Following two extensions of the initial thirty-day deferral, counsel for the EL Trustees notified the Reorganization Court by letter dated June 14, 1976 that an agreement had been reached between the parties, subject to the Court's approval. Thereafter the EL Trustees petitioned the Reorganization Court for approval of the amendments to the Agency Agreement designed to provide compensation to Conrail.

The proposed amendments stated in pertinent part:

> 9. *Compensation and Term.* For the 15-month term of this Agreement ending June 30, 1977 ConRail will be compensated for its services as agent under this Agreement in the amount of $1,825,000, to be paid as provided in Section 5(a) hereof. ConRail agrees that it will complete all of the work called for by this Agreement within said term (or will complete all such work thereafter without additional compensation), except such work as may not be completed by ConRail in the following areas, as to all of which ConRail agrees to use its best efforts to complete the same within the 15-month term of this Agreement:
>
> (1) Legal Department—injury claims;
> (2) Personnel Department—employee wage claims;
> (3) Accounting Department—(revenue area):
> (a) statements of differences
> (b) overcharge claims

---

2. The Reorganization Court's ruling in Order No. 506 has been appealed to this Court by Conrail and USRA and is pending as Case No. 76–1569.

In the event ConRail determines that it is necessary to employ outside attorneys, outside auditors or other outside contractors to complete any work required under the terms of this Agreement (whether or not it is required to be completed within the 15-month term of this Agreement), ConRail will first consult with the Trustees as to the necessity for such employment. In the event of any such employment, the cost thereof will, at the option of ConRail, either be borne by the Trustees directly or through reimbursement of ConRail. ConRail will, in addition, be reimbursed for services performed under Appendix G of this Agreement as therein provided. All such compensation shall have a priority of payment from the segregated account.

The EL Trustees averred in their petition that the foregoing compensation terms "are fair and that it is in the best interests for the Estate to adopt such terms . . . ."

The Indenture Trustees filed an answer in opposition to the petition of the EL Trustees, asserting that the proposed amendments were not in the best interests of the EL estate and that the Rail Act, as amended, did not authorize the payment of any such fee to Conrail.

A hearing on the petition was held on July 9, 1976. Counsel for the EL Trustees conceded that the EL Trustees had initially taken the position that compensation should not be required to be paid to Conrail, but he noted that the EL Trustees had changed their position in reliance upon the April 2, 1976 decision of Judge Fullam of the United States District Court for the Eastern District of Pennsylvania, which decision held that Conrail was entitled to be compensated by the Penn Central Transportation Co. Trustees for Conrail's services as agent of the Penn Central estate. *In Re Penn Cent. Transp. Co.*, 411 F.Supp. 1079, 1090–91 (E.D.Pa.1976). Counsel for the EL Trustees stated:

Judge Fullam's very strong language made us reach the conclusion that in order to protect our own interests in the relationships with Conrail that we, as

well as Penn Central, should make some arrangements for compensation.

Later in the hearing counsel for the EL Trustees further stated:

We, frankly, felt that however good a case one might make, it would be not in the interests of the Estate to have ConRail directed to perform our services free when it was getting compensation for doing work for other estates. We frankly, were a little concerned that that might rebound to our detriment.

The Court responded in pertinent part:

The concern to this Court is the constant and continual emasculation of the estate by the Government. It's coming to the point where there is going to be nothing left for the creditors, secured and otherwise.

Mr. Harry Zilli, an executive officer of the EL estate, testified on direct examination as follows:

Q Would you describe generally the factors which you took into account in determining what the amount and arrangements for compensation should be?

A Yes. The approach we took on coming up with the amount that was finally determined to be the compensation amount, we took into consideration the total amount of work involved, post-conveyance, to handle all the pre-conveyance responsibilities and papers. Our estimates showed that for the month of April we would have had to have approximately 362 people on a full-time basis and the following month of May, 218 people on a full-time basis.

We worked this out to the extent of continuing the work and finishing the work and this took us to the end of 1978.

Based on these factors, we then looked at the original estimates that were submitted by the USRA in their testimony under the Section 211(h) hearings where they had come up with a figure in the area of $5,111,000 as compensation to do the work.

With that figure in mind and the total amount of work that we thought would be necessary, we therefore negotiated back and forth and came up with a figure of $1,825,000.

Mr. Zilli further testified:

Q Do you believe that from the standpoint of the Estate the compensation arrangement is a fair and reasonable one?

A Yes. Based on the factors of the work to be performed within the 15-month period and the amount of people and expenses to be incurred, we feel that the figure of $1,825,000 is a fair figure.

Counsel for Conrail noted at the hearing that Conrail's proposal for a compensation fee in the final negotiation stages was approximately $300,000 higher than the figure which was finally agreed upon by the parties. He also pointed out that in addition to the Penn Central estate, three other estates, i. e. Ann Arbor, Reading, and Lehigh Valley, had agreed to compensate Conrail for its agency services.

Counsel for the Indenture Trustees appeared at the hearing in opposition to the proposed amendments, asserting that Congress intended that Conrail should serve as agent without compensation because Conrail was the "prime beneficiary of the Section 211(h) arrangement."

On July 16, 1976 the Reorganization Court entered Order No. 540 (the subject of this appeal) denying the EL Trustees' petition and thereby denying compensation to Conrail for performance of the agency services. The Court based its decision on two premises; the first premise was that the legislative history of the Rail Act showed that Congress had no intention to allow Conrail any compensation for performing its agency functions. The Court noted that a 1975 Congressional Conference Report provision regarding then § 211(h)(3) had

provided that Conrail could recover from the estates the direct costs, including attorneys' fees and court costs, incurred by Conrail in seeking reimbursement for § 211(h)(1) loan monies advanced through it to the estates. The Conference Report provision, however, was specifically deleted from the final version of the 1976 Act, and the Reorganization Court concluded that this deletion evidenced "an unequivocal congressional intent to exclude any provision relating to compensation or reimbursement to Conrail."

The second premise of the Court's decision was that Conrail had benefited from the § 211(h) program. The Court concluded:

[P]ursuant to the 211(h) arrangement Conrail has acquired a substantial portion of the Debtor's assets, employees and goodwill derived from the non-disruption of business relationships. The Court is of the opinion that these factors constitute sufficient consideration without further eroding the Estate by providing additional compensation by judicial decree in disregard of the Act and its amendments.

On July 26, 1976 Conrail petitioned the Reorganization Court for an order permitting it to terminate its agency relationship with the EL estate.[3] Conrail asserted:

4. Because of the limited amount of funds in the agency segregated account and the unavailability of Section 211(h)(1) loan funds except in regard to employee-related obligations of the Estate, the continued performance by Conrail of services under the Section 211(h)(2) agency relationship is not of benefit to Conrail, nor does it have any significant impact in terms of preventing disruptions in ordinary business relations as contemplated by Section 211(h). The work currently being performed by Conrail thereunder is almost exclusively for the benefit of the Estate, and will continue to be of that character for the foreseeable future.

---

**3.** Conrail's July 26, 1976 petition was, in form, a request to modify the relief requested in a petition which it had filed on July 1, 1976 (and which had remained pending). In the July 1, 1976 petition Conrail had sought instructions as to the manner in which it should distribute the funds available in the agency account. Ultimately, on October 20, 1976 the Reorganization Court authorized Conrail to withdraw its July 1 petition.

On July 30, 1976 the Court denied Conrail's request to terminate the agency relationship.

## II

The sole question presented by this appeal is whether the Reorganization Court was correct in ruling that Conrail was not entitled as a matter of law to receive compensation for serving as agent of the EL Trustees pursuant to § 211(h)(2) of the Rail Act, as amended, which provides in relevant part:

> The trustees of each railroad in reorganization in the region shall attempt to negotiate agency agreements with . . . [Conrail] . . . for the processing of all accounts receivable and accounts payable attributable to operations prior to the conveyance of property . . . and for the payment of only those accounts payable which relate to the obligations of the estates identified in paragraph (1) of this subsection. If any railroad in reorganization in the region fails to conclude such an agreement within a reasonable time prior to such conveyance, the applicable reorganization courts, after giving all parties an opportunity to be heard, shall prescribe the terms of such an agency arrangement by order, giving due consideration to the need, wherever possible, to make such agreements uniform among the various estates. . .

Section 211(h)(2) and provision number 10 of the Agency Agreement between the EL Trustees and Conrail both contemplate that the Reorganization Court retains the power to review the actions of the parties to the Agency Agreement. Provision number 10 states in pertinent part:

> This Agreement shall become effective on April 1, 1976, subject to prior approval by the Reorganization Court. The Reorganization Court shall retain jurisdiction over the subject matter of this Agreement and shall determine any disputes concerning the interpretation or application of its terms and conditions.

The language of § 211(h)(2) and of provision number 10 of the Agency Agreement is reinforced by § 77 of the Bankruptcy Act, 11 U.S.C. § 205, which section is supplemented by the Rail Act and under which section EL filed a petition seeking to reorganize on June 26, 1972.

As stated in 5 Collier, Bankruptcy (14th Ed. 1976), § 77.11, at 498–501, with reference to § 77 of the Bankruptcy Act:

> The bankruptcy court in which a railroad reorganization petition has been filed and approved has the same exclusive and non-delegable control of the administration of the estate in its possession as it would have over the estate of an ordinary bankrupt . . . .. Once the reorganization petition is filed, the court's control comes into being and may not thereafter be successfully challenged by other courts, state or federal. The jurisdiction thus acquired is summary, and the court may, through its exercise, determine all questions relating to the property in its possession. [Footnotes omitted].

■ This is the rule in ordinary bankruptcy proceedings. The Bankruptcy Court has exclusive jurisdiction to determine whether it is beneficial to the bankrupt's estate to approve a contract which the trustee in bankruptcy desires to enter into, which contract will result in a charge against the estate.

■ In the present case the charge was $1,825,000, which will result in a priority claim treated as costs of administration, which priority claim will displace not only claims of general creditors but also the liens of the Trust Indentures securing mortgage bond issues and will affect the validity of bonds held by the public.

Surely the Bankruptcy Court would have a right to determine whether the Agency Agreement involving this huge cost was for the benefit of the bankrupt's estate or whether it was in reality for the benefit of Conrail. The Court has made that determination. It cannot be said that the determination of the Court which was familiar with the condition of the bankrupt's estate, was arbitrary or unreasonable. If Conrail dis-

puted that the agency service was for its own benefit it was not required to enter into the Agency Agreement.

As previously noted, the Reorganization Court was concerned with "the constant and continual emasculation of the estate by the Government." The Court further stated:

It's coming to a point where there is going to be nothing left for the creditors, secured and otherwise.

Also, as stated by the Seventh Circuit in *National R.R. Passenger Corp. v. Blanchette*, 551 F.2d 127, 134 (7th Cir. 1977):

[I]t seems quite clear to us that in a railroad reorganization, the power to resolve all disputes involving the estate and to determine the enforceability and status of all claims is vested exclusively in the Reorganization Court.

Thus it follows that the Reorganization Court in the present case had the power to review the actions of the EL Trustees and Conrail consistent with the purposes of § 77, *i. e.* to provide for the rehabilitation and reorganization of the debtor railroad, rather than for the liquidation of the debtor as provided for in ordinary bankruptcy proceedings. As conceded by Conrail in its brief to this Court at 14 n. 22, "[t]he Trustees of a railroad in reorganization are officers of the Court, and the prudence of their actions is, of course, always subject to review by the supervising court."

■ In the present case, however, we are concerned with more than just the "prudence" of the actions of the EL Trustees and Conrail. An examination of the statutory language of the Rail Act, as amended, and of the legislative history of the Rail Act, as amended, reveals that Congress intended that Conrail should not receive compensation for most of the services it performs as agent of the railroad estates. Therefore, the amendments to the Agency Agreement concerning compensation to Conrail, which amendments were proposed

by the EL Trustees and Conrail, were far more than imprudent; they were, in fact, not legally authorized by the Rail Act, as amended.

### III

Analysis of the legislative history of the Rail Act, as amended, and the absence of any authorization therein, express or implied, for compensation to Conrail as agent of the railroad estates, leads us to conclude that Congress viewed the benefits to Conrail accruing from the § 211(h) program as sufficient consideration for Conrail's services as agent of the estates.

The major premise of the Reorganization Court's holding in the present case was that Conrail had benefited from the § 211(h) program by acquiring "a substantial portion of the Debtor's assets, employees[4] and goodwill derived from the non-disruption of business relationships." [Footnote added]. We agree. While we recognize that the EL estate also benefited from the operation of the § 211(h) program, the legislative history is clear that the primary intended beneficiary of the § 211(h)(1) loan program was Conrail. As explained in the Report of the House Committee on Interstate and Foreign Commerce on H.R. 14932:

The loans were designed to preclude disruptions in rail operations due to the inability of the bankrupt estates to currently meet their obligations to employees, shippers, other railroads, and suppliers for materials and services rendered immediately prior to conveyance on April 1, 1976. It was clear that the claimants would probably react against ConRail and the other acquiring carriers if their unpaid claims were not timely paid because they were left with the estates to be individually collected through the reorganization courts.
(H.R.Rep.No.94–1479, 94th Cong., 2d Sess. 14 (1976))

Furthermore, the 1976 amendments to the Rail Act reveal that Congress had sev-

4. Most of the Erie employees engaged in rail-related operations became Conrail employees on April 1, 1976.

eral clear opportunities to provide for compensation or reimbursement to Conrail as agent of the estates and declined to do so except in certain specified circumstances.

First, it should be noted that Congress twice has indicated that the estates should not bear the financial burden, and thus erode their assets, of reimbursing Conrail for the costs incurred by Conrail, such as attorneys' fees and court costs, in seeking reimbursement from the estates for claims paid by Conrail with § 211(h)(1) loans. As noted by the Reorganization Court in the present case, a provision in the December 18, 1975 Report of the Committee of Conference on S.2718, S.Rep.No.94–585, p. 64, which provided that the estates should reimburse Conrail for such direct costs incurred by Conrail in seeking reimbursement for § 211(h)(1) loan monies advanced through Conrail to the estates, was specifically deleted from the final version of the 1976 Act. *See In Re Penn Cent. Transp. Co.*, 411 F.Supp. 1079, 1090 (E.D.Pa.1976).

Subsequently, the October, 1976 amendments of RTIA added a provision to the Rail Act whereby Conrail could recover such costs not from the estates, but rather from USRA; 45 U.S.C. § 721(h)(1)(B)(v)(I) requires that the § 211(h) loan agreement between Conrail and the finance Committee of USRA include a provision which—

(I) provides for the Corporation to receive reimbursement from the Association for any expenses incurred in seeking reimbursement from any railroad in reorganization in the region for an obligation paid on its behalf under this subsection.

As stated by the House Conference Committee, H.R.Rep.No.94–1743, 94th Cong., 2d Sess. 36 (1976):

[T]he amendments clarify Congress' intent that Conrail be fully reimbursed for its expenses in performing its responsibilities in perfecting the claims for reimbursement, and provision for such compensation is to be included in the agreement between Conrail and the Finance Committee.

(*Reprinted in* [1976] U.S.Code Cong. & Ad.News 5859.)

Second, Congress specifically added in October 1976, two provisions to § 504 of the Rail Act, 45 U.S.C. § 774, which provided that Conrail could be reimbursed by the estates for the payment of not only certain employee claims but also for the "costs and expenses of processing such claims." Prior to the October, 1976 amendments, § 504(e), 45 U.S.C. § 774(e), required that—

In all cases of claims by employees, arising under the collective bargaining agreements of the railroads in reorganization in the region . . . [Conrail] . . . shall assume responsibility for the processing of any such claims, and payment of those which are sustained or settled on or subsequent to the date of conveyance ' . . . and shall be entitled to direct reimbursement from [USRA] pursuant to section 721(h) of this title.

*See In Re Cent. R.R. of N.J.*, 425 F.Supp. 1055, 1065–68 (D.N.J.1977), for a discussion of § 504.

The October, 1976 amendments to 45 U.S.C. § 774(e) added, *inter alia*, the following provision:

[Conrail] shall be entitled to a direct claim as a current expense of administration, in accordance with the provisions of section 721(h) of this title . . . for reimbursement (*including costs and expenses of processing such claims*) from the estate of the railroad in reorganization on whose behalf such obligations are discharged or paid. (Emphasis added).

Likewise, prior to the October, 1976 amendments of RTIA, § 504(g) of the Rail Act, 45 U.S.C. § 774(g), required Conrail to assume pre-conveyance claims for personal injuries to employees under FELA, but made no express allowance for reimbursement from the estate of the railroad in reorganization. The October, 1976 amendments to 45 U.S.C. § 774(g) added, *inter alia*, the identical provision which was added to 45 U.S.C. § 774(e), *i. e.* that Conrail was entitled to reimbursement from the estate of the amounts paid by Conrail for employee [personal injury] claims "*includ-*

*ing costs and expenses of processing such claims."* (Emphasis added).

The Report of the Senate Committee on Commerce on S.3131, S.Rep.No.94–851, 94th Cong., 2d Sess. (1976), reveals that the processing of these particular employee claims was expected to extend over a long period of time and therefore was accorded special treatment. The Report stated at 7:

> Because of the extended time period over which collective bargaining claims and FELA claims will be processed, Con-Rail would be authorized to use loan funds on a current basis *to reimburse its costs and to provide reasonable compensation for its services associated with the processing of the claims involved.* (Emphasis added).

(*Reprinted in* [1976] U.S.Code Cong. & Ad.News 5844). *See also* H.R.Rep.No.94–1479, 94th Cong., 2d Sess. 18 (1976).

These express provisions in 45 U.S.C. § 774(e), (g) for compensation to Conrail for its agency services associated with the processing of employee collective bargaining and personal injury claims, and the absence in § 211(h), 45 U.S.C. § 721(h), of any such provision for compensation or reimbursement to Conrail for its agency services associated with the processing of all other § 211(h)(1) claims against the estates, shows that Congress did not intend that Conrail should be compensated for performing its other agency services. *See Markham v. Cabell,* 326 U.S. 404, 411, 66 S.Ct. 193, 90 L.Ed. 165 (1945); *In Re Erie Lackawanna Ry., Debtor, supra* at 630; and 2A Sutherland, Statutory Construction §§ 47.23, 47.24 (4th ed. 1973).

Third, the October, 1976 amendments of RTIA amended § 304(e)(5) of the Rail Act, 45 U.S.C. § 744(e)(5), by inserting a new paragraph (C) which provides that Conrail would be retroactively compensated for improvements made by Conrail on commuter lines and rail equipment during the period of 180 days immediately following the date of conveyance. As explained in the House Conference Report, H.R.Rep.No.94–1743, 94th Cong., 2d Sess. 39 (1976):

> As the intent of Congress to allow Con-Rail to be compensated for providing an attractive and quality commuter service as opposed to continuing the bankrupt railroad practices or deferred maintenance, the clarifying amendment allows ConRail to provide a quality service with assurance of retroactive compensation.

(*Reprinted in* [1976] U.S.Code Cong. & Ad.News 5862).

This amendment, while not directly related to Conrail's performance of § 211(h)(2) agency services, nevertheless further indicates that Congress specifically gave attention to the matter of compensation to Conrail and that Congress chose to provide for such compensation only in very specific instances, and declined to compensate Conrail for most of its § 211(h)(2) agency services.

Finally, it is significant that the October, 1976 amendments of RTIA amended § 211(h)(2) of the Rail Act, 45 U.S.C. § 721(h)(2), so as to provide that Conrail, pursuant to the agency agreement, would pay "only those accounts payable which relate to obligations of the estates identified in paragraph (1) of this subsection." Thus the § 211(h)(2) agency agreement relates only to § 211(h)(1) obligations, but nowhere in § 211(h)(1) is compensation to Conrail included as an obligation of the estates. The October, 1976 amendments of RTIA specifically added four categories of claims to those claims which could be classified as "obligations of the railroads in reorganization" and for which loans could be made; none of these four new categories, nor any of the original six categories, includes compensation to Conrail.

Congress had a clear opportunity to add compensation or reimbursement to Conrail for performance of its agency services to the list of obligations of the estates enumerated in § 211(h)(1)(i) through (x) and declined to do so, thus further evidencing an intent not to burden the estates with the costs of compensating Conrail for its agency services.

IV

Conrail relies primarily on certain language in the Final System Plan (FSP) and on the decision of Judge Fullam in *In Re Penn Cent. Transp. Co.*, 411 F.Supp. 1079, 1090–91 (E.D.Pa.1976), for its contention that Conrail is entitled to compensation for its agency services pursuant to § 211(h)(2).

The FSP was promulgated by USRA on July 26, 1975 and was approved by Congress in the 1976 amendments to the Rail Act, § 208(d)(1), 45 U.S.C. § 718(d)(1). Volume I of the FSP stated at 57:

> To facilitate an orderly transfer of business operations, Conrail management and the railroads in reorganization may enter into agreements whereby Conrail would, *for reasonable compensation*, process the accounts receivable, as well as certain assets and liabilities that exist at the date of asset conveyance. The forecasts assume that if such items are processed by Conrail, Conrail will not receive title to such assets and liabilities, but will act solely as agent for the estates of the railroads in reorganization and will refund any excess cash ultimately realized or bill the estates for any cash deficiencies incurred from the processing. (Emphasis added)

As noted by Judge Fullam in his decision at 411 F.Supp. at 1090, this "fleeting" reference in the FSP might "be interpreted as suggesting that USRA assumed that Conrail would be compensated for its service as agent." Even Judge Fullam, however, further noted that "the FSP is essentially silent upon this issue . . . " and he declined to base his decision on this vague language in the FSP.

We are of the opinion that Congress was aware of the issue of Conrail compensation in light of this language in the FSP, and that Congress obviously determined that only certain agency services performed by Conrail actually merited compensation or reimbursement to Conrail in view of the purposes of the Rail Act. Therefore, Congress specifically provided for compensation or reimbursement to Conrail in just a few statutory provisions of the Rail Act and declined to provide for compensation to Conrail for all of the other agency services which it performed.

Moreover, we cannot interpret the word "negotiate" in § 211(h)(2) as proof that Congress intended that the matter of financial compensation could be the subject of the negotiation of the agency agreements without court approval. As demonstrated by the ten-page Agency Agreement between Conrail and the EL Trustees, there are various matters upon which the parties to an agency agreement must negotiate without necessarily touching upon the issue of financial compensation to Conrail.[5]

Conrail's reliance on the decision of Judge Fullam is equally unpersuasive. Judge Fullam, citing absolutely no statutory or case law authority, determined at 411 F.Supp. at 1090:

> To require Conrail to meet its own payroll and overhead expenses for the purpose of enabling its employees to handle the Debtor's accounts *gratis* simply does not seem equitable.

Unlike Judge Fullam, we decline to engraft new statutory requirements upon the Rail Act, as amended, on the sole basis of questionable notions of equity and under the guise of judicial construction. The proper course by which to seek any such requirement in the Rail Act is not by way

---

5. Some of the matters upon which the EL Trustees and Conrail negotiated in the Agency Agreement were: determination of whether a particular account receivable or account payable is attributable to pre-conveyance operations; determination of the method of handling outstanding uncollected accounts receivable; determination of which of the Trustees' prepayments, working funds, advances and deposits Conrail will assume; determination of whether Conrail may invest certain funds from its segregated account of collected accounts receivable; determination of the priority of payment of certain accounts payable and other terms, conditions, and principles of payment; determination of which books, records, and reports the Trustees will provide to Conrail and which records Conrail will maintain on behalf of the Trustees; determination of the method of handling interline accounts; and determination of the audit and inspection rights of the parties to documents pertinent to the Agency Agreement.

**350**

of judicial legislation but rather by way of Congressional enactment.

The legislative history of the Rail Act, as amended, is clear that Congress did not intend that Conrail should be compensated for most of the functions it performs as agent of the EL Trustees pursuant to § 211(h)(2) of the Rail Act, as amended.

Accordingly, the judgment of the District Court is AFFIRMED.