Robert L. **MUSTO**, et al.

v.

**AMERICAN GENERAL CORPORATION**, et al.

No. 3–85–0546.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 23, 1985.

Robert L. Ballow, R. Eddie Wayland, Douglas R. Pierce, Mark Floyd, Nashville, Tenn., for plaintiffs.

William C. Humphreys, Jr., Atlanta, Ga., Thomas H. Peebles, III, Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, Chief Judge.

This case considers whether an employer (or its successor in interest) can unilaterally terminate or materially alter retirement benefits after employees have provided years of service and have left active employment with the company. The named plaintiffs, on behalf of themselves and all others similarly situated, filed this action under the Employee Retirement Income Security Act of 1974, [ERISA], 29 U.S.C. §§ 1001–1461, and the applicable federal common law, as well as under Tennessee common law. Plaintiffs seek: benefits under the terms of employee benefit plans established by defendants or their predecessors in interest, a declaration of plaintiffs' rights to such benefits, preliminary and permanent injunctions prohibiting the denial of the benefits, and compensatory damages and punitive damages. A hearing was held on July 29, 1985, through August 1, 1985, to review plaintiffs' motions for class action certification and preliminary injunction. Subject to the conditions set forth in this opinion, the Court certifies the case to proceed as a class action pursuant to Fed.R.Civ.P. 23(b)(2) and, also, issues a preliminary injunction.

### I. *Findings of Fact*

In 1939 The National Life and Accident Insurance Company [National Life] established an annuity and life insurance program for its employees and future retirees. In 1945 National Life established a health insurance plan for its employees and future retirees. In 1968 NLT Corporation [NLT] was formed to be a holding company for National Life and other affiliated subsidiaries. NLT assumed plan sponsorship for the employee benefit plans established by National Life. All subsidiaries of NLT were thereafter covered by the NLT plans. The named plaintiffs are all retirees of National Life, NLT or its subsidiaries who receive or were eligible to receive pension and welfare benefits as a result of their service to their former employer.

*The Security Program*

a) *Its Promotion*

The employee benefit plans provided by National Life and NLT were collectively known as the Security Program. The Security Program offered retirees a pension, paidup life insurance and lifetime medical insurance. (Exhibits 18, 19, 20). National Life and NLT used its Security Program as a recruiting device to solicit new agents and also as a bargaining point in attempting to convince its own agents to continue on with the corporation. At this point in the proceeding, it does not appear that all prospective or actual employees were told that retirement benefits were irrevocable or permanently fully "paid up" by the employer, requiring no post-employment premiums. Some individual retirees, however, may have received such representations. (Exhibit 25—Memo to Cecil Sparkman from Doris Durard, Assistant Secretary, Security Program Division of National Life, responding to specific request for status of retirement benefits: "No contributions required for group life or medical after retirement.").

Over the years, the National Life/NLT Security Program underwent changes, including changes necessitated by the enactment of ERISA. The changes resulted in overall improvements in retirement benefits under the program over the years. (Exhibit 50 and D. Durard Testimony). Among the features of the program were life and medical insurance coverage which continued after retirement and, up until January 1, 1984, required no payment of premiums of the retiree.

National Life maintained its home office in Nashville, Tennessee. However, it maintained and staffed district offices in cities and towns across the country. The district managers and other supervisory personnel were, in addition to being responsible for the selling and servicing of insurance policies, continually required to recruit sales agents for the company. They were also required to counsel employees about the Security Program benefits and provide information regarding the Security Program.

NLT and National Life utilized the Security Program as a major inducement to attract employees. The promise of continued benefits at no cost to the individual after retirement was a material part of the presentation to prospective employees. Promotion of the Security Program was made both in written publications and through oral representations by company agents. Potential employees were advised by brochures, filmstrips, and audio recordings, as well as by the representations of recruiters, that the Security Program was one of the most liberal benefit packages in the country. (*See e.g.*, Exhibits 21 and 22. "You pay absolutely nothing into this outstanding retirement plan. The company pays all the cost. It's National Life's way of saying "thank you" for years of loyal service, and we think it's a good way.").

NLT and National Life also utilized the Security Program as an inducement to persuade employees to remain with the company rather than going to work for competitors or other employers. The testimony of witnesses who held district manager and other higher management positions indicates that whenever a good employee was considering leaving the Company, he or she would be reminded of the excellent retirement benefits available from National Life or NLT. Management would emphasize the fact that medical and life insurance would continue at no cost after retirement. The Security Program was responsible, at least in part, for retaining a productive and reliable work force for NLT and National Life.

At least once yearly all NLT and National Life employees received a personal statement setting forth the benefits each individual employee was entitled to receive under the Security Program. These personal statements of benefits addressed both present benefits and future benefits after retirement. Further, these statements emphasized that the employees would not be required to contribute for continued life and medical insurance coverage after retirement. (Exhibit 11). Pursuant to Company instructions, managers reviewed the annual statements with all their subordinates emphasizing the present and future benefits provided by the Company. (R. Musto and G. Laurence Testimony).

In district meetings held generally on a monthly basis, sales agents of the district were reminded of the Security Program and its retirement benefits with the promise of continued life and medical insurance coverage at no further cost. Also, at least three or four times a year all field employees were shown a special audio-visual presentation on the Security Program. This presentation emphasized the major features of the program, including retirement benefits and continued medical and life insurance at no cost.

National Life and NLT maintained a chain of command to assure the uniform administration of and dissemination of information concerning the Security Program. Corporate protocol required employees to go to their district manager if they had a question concerning benefits. (K. Sanders Testimony). Home office correspondence to field employees concerning their benefits was sent to and distributed by the district manager. (Exhibit 25). Whenever an improvement was made to the Security Program for retirees, district managers were informed so that they could in turn show employees that NLT was taking care of its retirees. (Exhibit 7).

In addition to recruiting materials, film strips and other materials, NLT and National Life furnished employees summary booklets every several years that set forth the Security Program provisions, including the provision of continued benefits at no cost after retirement. (Exhibits 5, 18, 19 and 20). NLT and National Life also regularly printed official company publications for its employees which, on at least two occasions, provided detailed information about the Security Program, including the fact that retirement benefits were furnished at no cost to the retiree. (Exhibits 8 and 9).

Finally, in numerous other communications to employees, National Life and NLT emphasized the benefits available after retirement under the Security Program. For example, general notices were sent to em-

ployees which referred employees to the summary booklet provisions concerning continued life and medical coverage at no cost after retirement. (Exhibit 6). Responses to employee inquiries regarding anticipated retirement benefits reaffirmed this no cost feature. (Exhibit 25). In addition, applicants for disability retirement were issued a statement promising medical and life insurance benefits at no cost after retirement. (Exhibit 30).

In short, National Life and NLT aggressively promoted the protection it would give its employees and retirees. The promise of continued benefits at no cost after retirement was continually reaffirmed in various ways.

b) *Termination/Modification Clauses*

The problem in this case arises because at the same time NLT and National Life were promising retirement benefits at no cost to its employees, the corporations were including in certain important documents termination/modification clauses that reserved to the companies the right to amend or rescind the promised benefits. Among the documents introduced at the hearing, the Court identifies three types of documents which contain the termination/modification clauses:

First, a right to change or terminate medical and life insurance appeared in the official master plan documents or policies. (Exhibit 48). These documents, however, were not distributed to employees, nor were they readily available.

Second, individual certificates of insurance for life and medical insurance issued to active employees indicated that coverage could be terminated. (Exhibits 24 and 46). At retirement, a retiree was issued a new certificate for his post-employment years which also reserved to the company the right to amend or terminate the promised benefits. (Exhibit 47).

Third, the company distributed summary booklets every few years which explained the medical and life insurance benefits available both before and after retirement. (Exhibits 18, 19, 20). After the enactment of ERISA, the booklets were referred to as summary plan descriptions. (Exhibit 2). Prior to 1977, the booklets typically contained the following clause:

The Group Insurance provisions of the Security Program have been arrived at after careful study, and it is the Company's expectation that they will be continued indefinitely. However, since it is not possible to foresee the future, the Company must reserve the right to change or even discontinue these provisions if it becomes necessary. (Exhibit 18).

In 1977 the clause was changed to read:

The Company fully intends to continue the Plan indefinitely and to meet any foreseeable situations which may occur. However, the Company does, as it always has, reserve the right to change the Plan and, if necessary discontinue it. (Exhibit 5).[1]

c) *Amendment of Medical Insurance Benefits*

The right to "paid up" medical insurance coverage is promised in relevant provisions of the 1977 Group Insurance Plan (Exhibit 5 at p. 23):

Comprehensive Medical Expense Insurance

After your retirement under the Company's Retirement Plan, Comprehensive Medical Expense Insurance coverage will continue on you, and on your spouse if your spouse has been covered immediately prior to your retirement date....

\* \* \* \* \* \*

No contributions are required for continued coverage on you and your spouse after retirement....

---

1. At the hearing, the defendants focused attention on the change in the meaning created by the placement of the term "if necessary" as a modifying clause to the company's right to discontinue the plan. Before 1977, the "if necessary" qualification applied equally to amendments and terminations of the plan. Defendants argue, therefore, that after 1977 the defendant need only show cause prior to plan termination and that amendments may be made at will.

The booklet was prepared for and distributed to active employees as well as to retirees.

American General Corporation [American General] acquired NLT on November 4, 1982. American General is a Texas corporation that is the parent of a number of other insurance companies. Defendants currently are responsible for the administration of plaintiffs' pension and welfare plans.

In the merger agreement and elsewhere, American General agreed to maintain existing NLT employee benefits, including the Security Program, in effect at the time of the merger.[2] The successor further promised that if it integrated NLT's benefit programs with existing American General programs, American General would provide NLT's employees with overall benefits comparable to those in effect at the time of the merger. Similar to NLT, American General was self-insured with respect to the life insurance and medical benefit plans.

After the corporate merger and until December 31, 1983, National Life and NLT provided their retirees and the retirees' spouses with medical insurance having a lifetime maximum benefit of $100,000.00 per person after retirement. The medical insurance had an annual deductible of $100.00 per person. The insurance plan paid 100% of a person's surgical fees. It also paid 100% of the first $3,000.00 of hospital expenses and 80% of hospital expenses over that amount. A retiree and his spouse or dependents were required to pay no more than $500 in a calendar year, in addition to the per person deductible. This feature is referred to as a "maximum annual cost." Finally, the retiree was not required to make any further contributions to be eligible to receive this insurance.

NLT was self insured. The master insurance policy covering its life and medical insurance plans, including the provision for continued coverage after retirement, was with NLT's wholly owned subsidiary, National Life. According to the National Life Form 5500, Annual Report of Employee Benefit Plans, for the 1983 calendar year, NLT reported to the Internal Revenue Service that $42,263,925 constituted policyholder reserve "held to provide benefits after retirement," under the NLT Security Program. (Exhibit 27). Claims reserves in the amount of $208,005 were also maintained.

In November 1983, American General conducted numerous meetings at locations across the country for active employees formerly employed with NLT or its subsidiaries. The meetings were intended solely for current employees. Individuals who had already retired were not invited. At the meetings as well as in documents and other communications, defendants informed employees that on January 1, 1984, changes would be made in future retirement benefits. Employees were informed that after January 1, 1984, they would fall under the American General plan. (Exhibit 33). Hence, those employees who retired after January 1, 1984, would receive retirement benefits under the American General benefit plan, whereas those electing retirement prior to January 1, 1984, would come under the NLT/NLA plan.[3] The employees, which included a number of plaintiff retirees who had not yet retired at that time, were told they would not suffer any losses under the American General plan but would "get the best of both worlds."

By coming under the American General plan, the former NLT/NLA employees (now American General employees) realized the following changes from their former benefits under the NLT/NLA plan: An in-

---

**2.** Plaintiffs made this allegation at the hearings and in their pleadings, yet no direct evidence was presented at the hearing. However, defendants, while objecting to this finding because no evidence has been presented, do not deny that it is true.

**3.** As discussed below, this distinction warrants the certification of two subclasses in this case.

Subclass A constitutes those retirees who left active employment prior to January 1, 1984, and therefore fall under the NLT/NLA retirement benefit plan. Subclass B constitutes those retirees who left active employment after January 1, 1984, but prior to the changes put into effect on July 1, 1984.

creased lifetime maximum benefit to $750,-000.00 per person. The "up front" costs for a future retiree, his spouse and dependents, however, were increased. The January 1, 1984, plan offered three options of "up front" costs. The annual deductible per person was $275.00, $200.00 or $125.00. The maximum annual cost was $1,500.00, $1,000.00, or $1,000.00 per person and $2,500.00, $2,000.00, or $1,500.00 per family respectively. Additionally, surgical and hospital costs were reduced from 100% to 80%. Retirees leaving employment after January 1, 1984, would be required to make contributions to receive medical insurance. The dollar amount of monthly contributions varied depending upon the retiree's age, whether he elected to have coverage for dependents, and which of the three plans was chosen. Individuals who elected early retirement were told that they would have the same coverage and at the same cost as active employees. (Exhibits 33, 36 and 37). Contributions for those retirees over age 65 were lower since their benefits were coordinated with Medicare. All retirees contributed approximately 20% of the cost of their chosen insurance.

During the November 1983 meetings defendants represented that those employees who retired before January 1, 1984, would receive the same level of pension and welfare benefits, including medical insurance, as had been promised under the NLT Security Program. Neither during these meetings nor at any other time were plaintiffs orally advised that the insurance benefits would or could be reduced. As had been the NLT practice, the express reservation was made only in the plan documents identified above. Testimony indicated that company agents advised employees of the termination clause only if directly asked a specific question on the policy term. Paraphrasing the words of one such agent "you do not emphasize the negative."

A number of the still actively employed plaintiffs relied on defendants' representations regarding planned future changes in benefits. Some plaintiffs retired prior to January 1, 1984, so that they could receive the benefits provided under the NLT Security Program. Other plaintiffs decided not to retire but to remain as active employees and retire under the promised benefits plan which was to become effective on January 1, 1984.

Commencing on January 1, 1984, defendants began providing the welfare and pension benefits promised in November 1983 to those plaintiffs who retired on or after January 1, 1984. These pre-January 1, 1984, retirees continued to receive the same level of retirement benefits earned under the NLT Security Program.

In May 1984 defendants notified all plaintiffs who had retired before May 1984 (both pre- and post-January 1, 1984) that certain welfare retirement benefits would be changed effective July 1, 1984. (Exhibit 14). Six months after January 1 changes were put into effect. American General changed the plan again.[4] Plaintiffs were sent an election form giving them the option to enroll in the new plan at the stated cost and level of benefits or to reject the plan and "not participate," that is, to give up their insurance altogether. (Exhibit 26). Active employees who had requested retirement in May and June 1984 were notified of the changes after they applied for retirement. Other active employees were not advised of these changes until late June 1984. Also in May 1984, defendants announced a change in pension benefits. (Exhibit 35).

The July 1, 1984, medical insurance program, applied to *all* retirees, regardless of their retirement date. The plan provided a lifetime maximum benefit of $200,000.00 per person. (Exhibits 14 and 15). All plaintiffs were required to pay "up front" costs of an annual deductible of $200.00 per person and a maximum annual cost of

---

4. This fact is important with respect to those plaintiffs who were active employees during the 1983 meetings during which they were put in a position of deciding whether to retire before January 1, 1984, under the NLT/NLA plan or after January 1 under the American General plan.

$1,000.00 per person and $2,000.00 per family.

The July 1, 1984, changes eliminated the "paid up" policy under the NLT/NLA plan. All plaintiffs were required to make contributions for continued insurance coverage or permanently forfeit any and all retirement medical insurance benefits. Retirees under age 65 were required to contribute 25% of the cost of the insurance.[5] Retirees 65 and older were required to contribute 50% of the cost. Because of the coordination with Medicare for those over 65, the costs for all retirees was roughly the same. American General had determined that the claims made by retirees was not met by contributions, thereby placing a disproportionate burden on active American General employees to fund the medical insurance plan. (Testimony of Mr. Tuerff).

As a result of defendants' July 1, 1984, action, all named plaintiffs and members of the class they seek to represent, regardless of their retirement date, are receiving the same level of medical insurance benefits. Approximately 230 retirees or spouse survivors out of a putative class of at least 1,800, eligible to enroll in the American General Retiree Medical Plans "chose" not to enroll. At this point in the proceeding the Court cannot determine how many of these people chose not to enroll because the cost was prohibitive. (Exhibit 41).

d) *Escape Clause Provision for "Other Insurance"*

Another feature of the July 1, 1984, modifications was that if any retiree or his or her spouse was eligible as an employee for another employer's group medical insurance, then defendants would permanently cancel all medical insurance under the American General program for that retiree or spouse. (Exhibit 43). This escape clause applied even if a retiree or spouse elected not to be covered by the other employer's medical insurance. As of July 1, 1984, eight persons had been terminated pursuant to the "other insurance" provision. (Exhibit 43).

The program of medical insurance provided by National Life or NLT and the programs enacted by American General on January 1, 1984, were not subject to such a provision. Under previous plans, any insurance from another employer would be coordinated with the retiree medical insurance.

e) *Spousal Survivor Benefits*

Spousal survivor pension benefits allow a retiree, by electing a smaller present monthly benefit, to provide his or her surviving spouse with one-half the retiree's level of pension benefits upon the retiree's death. Under the NLT program retirees were able to enjoy their full pension benefit amount until age 65, at which time an election was required and contributions would begin. The NLT Pension Plan permitted those employees who retired before age 65 to defer election and contributions until reaching age 65.

After acquiring NLT, American General initially maintained the NLT/NLA spousal benefit election formula. (Exhibit 34). In May 1984, however, defendants notified all plaintiffs who either had taken or had applied for early or disability retirement after January 1, 1984, that they could not wait until age 65 to make an election; rather, the election was required immediately, together with immediate contribution toward the spousal survivor benefits (Exhibit 35). At no time before the May 1984 change did defendants advise plaintiffs that such a change would be forthcoming. (Exhibit 35, May 14, 1984 letter).

Based on these facts, the Court makes the following determinations with respect to (1) class certification and (2) preliminary injunction.

## II. *Conclusions of Law*

### A. *Class Certification*

The Court finds that the evidence presented at the hearing supports the certification of a class action in this matter. The case shall proceed as a class action

---

**5.** Defendants had intended to increase the contribution of retirees under age 65 to 50% on July 1, 1985; this court temporarily restrained such action on June 26, 1985.

pursuant to the provisions under Fed.R. Civ.P. 23(b)(2). All prospective members in the class shall be given written notice of the contemplated action, specifically delineating the nature of the action, the relief sought, the types of benefits and obligations a prospective class member would be entitled to should they opt out and continue under American General's present plan, and any other information material to class notification.

■ In opposing the procession of the hearing on the preliminary injunction and on class certification, the defendants challenge the propriety of a ruling on a preliminary injunction prior to a decision on class certification. Defendants maintain that no decision on the merits of the case should be made prior to class certification. Defendants argue that the issuance of preliminary injunction constitutes "the decision on the merits." The Court concludes that a hearing on class certification and on preliminary injunction may be held simultaneously. Fed.R.Civ.P. 23(c)(1) provides:

> As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

The hearing on class certification in this matter was held at the soonest practicable opportunity after the filing of the case. This Court entered a temporary restraining order on June 26, 1985. Under Fed.R. Civ.P. 65(b), the duration of a temporary restraining order is limited to ten days, unless the time is extended for good cause. Because of scheduling difficulties and by agreement of the parties, the Court did not hold a hearing on a preliminary injunction until July 29, 1985. In holding a consolidated hearing on both the class certification and the preliminary injunction, the Court was meeting the requirements both of Rule 65 and Rule 23.

The defendants' position misconstrues the requirements under Rule 23(c)(1). The first sentence sets forth the temporal guidelines for the Court, requiring a hearing on class certification "as soon as practicable." The second sentence permits the Court to issue a conditional order or to alter or amend the order before a decision on the merits. The second sentence, however, does not require certification of a class prior to any and all substantive injury; it merely requires that if a class certification order is to be altered or amended it must be made before the decision on the merits.

The issuance of a preliminary injunction does not involve " 'THE' decision on the merits." Rather, it represents a provisional determination made after a preliminary consideration of only a portion of the evidence available. Rule 23's reference to "the" decision on the merits connotes a final decision resolving the central issues of law and fact in the case, thereby defining the rights and obligations of the parties. A decision on a preliminary injunction is an interlocutory order, rendering provisional, extraordinary relief pending a full hearing and "the" decision on the merits.

This Court does not believe that it must hold two separate hearings at different times to determine issues of class and those relating to a preliminary injunction. The interests in judicial efficiency dictate that a court resolve such issues as early into the proceeding as possible. In this case, the Court was able to provide the parties four full court days during which to establish matters pertaining to class and to the preliminary injunction. The consolidated hearing avoided the unnecessary duplication of evidence, permitting the Court to resolve both issues in a single proceeding.

### 1. *Plaintiffs Have Demonstrated the Four Elements Necessary to Maintain a Class Action.*

■ Plaintiffs seeking to certify their suit as a class action must demonstrate the four prerequisites under Fed.R.Civ.P. 23(a): numerosity, commonality, typicality, and adequacy of representation. Upon consideration of the evidence, the Court is satisfied that the plaintiffs have met their burden in demonstrating these elements.

a) *Numerosity.*

Under the direction of a number of former NLT/NLA officers and managers, principally under the direction of Mr. Robert Musto, an association has been created comprised of retired persons from NLT/NLA. The association is known as NLTR. This group has actively solicited membership and contribution from all NLT/NLA employees. Response generally has been favorable. (Exhibit 17) (letters in response to NLTR solicitations). According to the testimony of Mr. Musto, over 1800 former employees have been solicited through the mail. The Court finds that the prospective class is so numerous as to make joinder impracticable. The requirement of numerosity is satisfied.

b) *Commonality.*

The issues of law and fact are common to the class. All retirees are treated under the same terms of the current plans regardless of when they retired. (E. Bottiggi testimony.) The claims all concern rights and obligations arising out of the employee benefit plans offered by NLT/NLA, with common issues of law arising under ERISA concerning the enforceability of those rights.

c) *Typicality.*

The Court finds that the claims of the representative party are typical of the claims of the class. Defendants argue that because the plaintiffs claim that their entitlement to continuation of paid up medical insurance policies rests on reliance on certain oral representations and individual written correspondence, each individual plaintiff presents a different set of facts requiring the Court's specific attention. While the Court recognizes that the particular representations made may, in some cases, differ between individual class members, the central material inquiry in this case concerns the long term, centrally directed campaign by NLT/NLA to solicit and retain employees with the inducement of the Security Program. The principal evidence of the promotional use of the Security Program consists of widely disseminated written materials (e.g., Exhibits 18, 19, 20) presented to the class as a whole. Although individual agent's representations may have differed, the company's aims and approach were uniform. Because the Court has the authority to alter or amend the class certification order, should it appear on a full hearing of the merits that unique circumstances surrounding certain representations and individuals' reliance exist, the Court may order that those issues be severed and considered separately from the class issues.

d) *Adequacy of Representation.*

The representative parties possess sufficient financial resources to maintain this action. Mr. Robert Musto testified that NLTR had thus far raised over $100,000 to support the legal effort. Class representatives have retained competent counsel. Because of the similarity in all class members' position vis-a-vis American General's treatment of their retirement benefits, the Court concludes that the representative parties have sufficient common interest with the unnamed members of the class and will vigorously prosecute the case to protect those interests. *Senter v. General Motors Corp.,* 532 F.2d 511, 524–525 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

The class action is maintainable under the provisions of 23(b)(2). That section provides:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Defendant does not dispute that it has acted uniformly in its treatment of all retirees retirement benefits. The same issues of law apply to all retirees (subject to the distinction drawn between the subclasses outlined below).

Pursuant to the provisions under 23(d), the Court finds it appropriate to order the representative parties to give notice to all prospective class members permitting those class members who desire to opt out

of the class action to do so. Because under the proposed new terms of the American General policy, certain benefits may be deemed more favorable, although premiums will increase, certain members may seek those additional benefits. Prospective class members should have the opportunity to decide whether to participate in seeking the relief sought by class representatives or to accept the amendments sought to be put into effect by American General. Class notification should provide all class members with an impartial account of their options under both the plan sought by the representative party and that offered by American General.

In certifying the class, the Court also certifies two subclasses pursuant to the provisions under 23(c)(4). Subclass A consists of all those retirees who left active employment prior to January 1, 1984. Subclass B consists of all those retirees who retired or were qualified but had not yet retired after January 1, 1984, but before July 1, 1984. Plaintiffs in Subclass A seek the level of retirement benefits offered as of December 31, 1983. Members of Subclass B seek the level of retirement benefits offered as of June 30, 1984. The level of benefits between Subclass A and Subclass B differs and there also may be certain differing facts concerning representations made to the members of Subclass B regarding amendments of the benefit plan. The representations and treatment of all members of both classes, however, is sufficiently common for all members to proceed in the same action.

### B. *Preliminary Injunction*

■ Four principal factors are crucial to the determination of whether to issue a preliminary injunction in a civil case: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm absent such extraordinary relief; (3) the impact on the public interest; and (4) the possibility of substantial harm to others. *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir.), *cert. dismissed*, —— U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). The Court finds that the plaintiffs have satisfied each of the four elements to warrant this Court's issuance of a preliminary injunction. The Court therefore restrains defendants (1) from implementing changes in the medical insurance plan that were to go into effect as of July 1, 1985, (2) from enforcing the escape clause provision terminating retirees' medical insurance benefits in the event that they secured employment with another employer offering medical insurance (persons so terminated shall be reinstated), and (3) from enforcing the May 1984 modification of spousal survivor benefits offered under the NLT/NLA plan. The preliminary injunction is aimed at maintaining the *status quo*.

### 1. *Likelihood of Success of the Merits.*

The Court approaches analysis of this issue keeping in mind the principal policy objective of Congress in enacting the Employee Retirement Income Security Act. That is, the need to safeguard employees' retirement income from unforeseeable, arbitrary and capricious reductions or modifications by former employers and others. H.R.Rep. No. 93–533, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639–40. Employees must be able to rely on the promises made by their employers regarding retirement benefits so they can reasonably predict the level of anticipated future sources of income and thereby formulate a responsible plan of financial support for their postemployment days.

### a) *ERISA Preempts the Plaintiffs' State Law Claims.*

■ The plaintiffs have stated a number of state law claims for misrepresentation and breach of contract under the common law of Tennessee. As to these claims, the Court finds that the plaintiffs have no likelihood of success on the merits. ERISA preempts state law provisions concerning employee benefit plans, federalizing the area of pension right and related ancillary welfare benefits by establishing uniform standards of fiscal responsibility for the administration of such plans. H.R.Rep. No. 93–533, 93rd Cong., 2d Sess., *reprinted*

*in* 1974 U.S.Code Cong. & Ad.News 4639, 4639–40; *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981); *Adcock v. Firestone Tire & Rubber Co.,* 616 F.Supp. 409 (M.D.Tenn. 1985).

### b) *ERISA's Statutory Framework*

The Court considers here two principal types of benefits at issue: the retirees' medical insurance benefits and the spousal survivor benefits. The former benefits are offered under a welfare benefit plan, while the latter are offered under a pension plan. Pensions are a form of deferred compensation to which an individual employee accrues rights by providing a period of service to a particular employer. Pensions provide the employee a secured measure of income following his retirement from active employment, thereby assuring a source of economic resources during one's later years of life. Welfare benefit plans, on the other hand, are not necessarily intended as deferred income to assure economic stability during one's post-employment days. Rather, the plans often serve as a form of deferred, frequently contingent, benefit that is offered by virtue of one's affiliation as an employee of a certain employer. 29 U.S.C. § 1002(1) and (2); *Adcock,* at 413–14 (severance pay benefits). However, in this case, the retiree medical insurance plan would constitute a welfare benefit offered as a non-monetary form of past-employment, deferred income.

Under ERISA, an employer often wears "two hats." On one hand, the employer devises and offers certain employee benefit plans as an incentive to his employees to remain with the company and to provide quality service. In this role, the employer formulates non-wage compensatory benefit plans and funds them out of its assets. The other role assumed by the employer usually is that of a fiduciary. Under ERISA, the administrator of an employee benefit plan is held to fiduciary standards of care in the administration and management of plan assets. 29 U.S.C. § 1101, *et seq.* Part of the employer/fiduciary's duties consist of compliance with the reporting and disclosure provisions under ERISA, 29 U.S.C. §§ 1021–31, which mandate the distribution of information concerning individual benefits under employee benefit plans.[6]

In this case, the Court is faced with the unusual situation in which the defendant employer wears three hats. American General is the (*successor*) employer formulating the employee benefit plans; the fiduciary charged with the administration and management of the employee benefit plans;[7] and, third, with respect to the medical insurance plans, the insurance carrier from whom American General, as employer, has "purchased" insurance policies so as to honor the welfare benefit plan

---

**6.** The Court at this point does not consider the claim of Mr. Musto regarding alleged violations of the reporting and disclosure provisions of ERISA.

**7.** The Court refrains from referring to American General as "trustee" of the medical insurance plan, but uses the term "administrator" instead. ERISA normally requires that benefit plan assets be held in trust by a person named fiduciary. 29 U.S.C. § 1103(a). However, the requirement that such a trust be established is not applicable to assets of an insurance company or assets of a plan held by an insurance company. 29 U.S.C. § 1103(b)(2). In this case, while policy reserves dedicated to the medical insurance plan constitute assets held by the fiduciary for the plan beneficiaries, these assets are not held in trust.

"[A]ssets placed in a separate account managed by an insurance company are separately managed ... insurance companies are to be responsible under the general fiduciary rules with respect to assets held under separate account contracts, and the assets of these contracts are to be considered as plan assets (but need not be held in trust)." H.R.Conf.Rep. No. 93–1280, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5077. The Court construes the master policy documents introduced as evidence at the hearing to constitute separate account contracts. At least for 1983 purposes, the assets held as reserves for such contracts were in an amount exceeding $42,000,000, as indicated on the Form 5500 National Life submitted to the IRS. Fiduciary standards of care apply to the administration of these assets.

obligations.[8] As employer, the Court will look to the obligations assumed by American General as the successor corporation to NLT and National Life regarding the funding of the disputed employee benefit plans. With respect to American General's fiduciary duties as administrator of the employee benefit plan assets, the Court will consider what obligations flow from its fiduciary duties in the management of the fund assets dedicated to the welfare benefit and pension plans, if any. Third, the Court will make limited observations concerning American General's role as the insurance carrier for the plans. The Court views this role as merely complying with Tennessee state law regulating an insurer's duty to assure proper reserves for the potential payment on insurance claims.

c) *American General's Funding Obligations as the Corporate Successor to the Plaintiffs' Former Employer.*

(1) *Medical Insurance Plan*

The principal consideration here concerns whether American General, in light of a four-fold increase in the cost of the medical insurance plan during the last five years, has the right to invoke the termination/modification clause contained in the employees' welfare benefit plan and thereby modify the terms of the present plan, increasing the retiree's deductible and premium costs while, in some respects, reducing the level of benefits offered. (*See* Exhibit 50). The issue is made particularly difficult in view of the gap in ERISA's statutory regulation concerning the legal status and enforceability of welfare benefit plan rights. Unlike pension plan rights, which are subject to elaborate vesting, participation, and funding provisions mandating minimum asset structure standards, 29 U.S.C. §§ 1051–86, welfare benefit plan rights are expressly exempted from these requirements. An employee therefore can "accrue" no "vested" right to medical insurance benefits. Defendants argue, therefore, that they are entitled to terminate or amend plaintiffs' level of benefits subject to the written terms of the plan, that is—at will. The Court disagrees.

(2) *Policy Under ERISA*

It would be contrary to the spirit of ERISA to hold that rights promised welfare benefit plans are mere gratuities terminable at the will of the employer. The defendants contend that welfare benefits may be amended at American General's discretion so long as the plan contains an unqualified modification/termination clause. The argument is antithetical to the policy objectives of ERISA. Congress has sought to fortify retirement income—not by mandating that individuals get more of it—but by seeking to assure that such income provide a reliable predictable source of financial support. Once an employee has rendered his years of service to the employer, his "sweat equity," and has taken retirement, the employee furnishes little to the employer that generates revenue; hence, the employer may perceive little risk in reducing the level of benefits previously promised. Since an active employee generates revenues beyond his wage and costs of overhead, he possesses the economic leverage to bargain for benefits. Freedom of the employee to leave—and with him the profits he generates, imposes a check on the employer's temptation to trim costs by reducing employee benefits. The employer who amends the company vacation policy reducing annual vacation days from two weeks to two days will experience a mass exodus of his labor pool. But, the employer who doubles the medical insurance premiums for his retirees will receive the in-

---

As to the pension plans, however, and in particular spousal survivor benefits, American General occupies the position of *trustee.*

**8.** The Congress recognized this "third role" assumed by self-insured insurance companies which offer employee insurance plans.

[I]t would be contrary to normal business practice to require the plan of an insurance company to purchase its insurance from another insurance company. This exemption is available only if no more than adequate consideration is paid for the insurance by the plan.

H.R.Conf.Rep. No. 93–1280, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 5038, 5094.

creased monthly checks from all those who can afford it and cannot find an adequate substitute source of protection.[9] The retirees have no economic leverage, hence no bargaining position to check modifications of benefits made solely in the interest of their former employer.[10] To permit the enforcement of termination/modification clauses without a showing of good cause has the effect of reducing the status of hard earned welfare plan benefits to mere gratuities. Accurate financial forecasting or retirement planning is impossible because continuation of the benefits is subject to the discretion of an employer. The exercise of such discretion without a "for cause" standard cuts against Congress' intent to safeguard these retirement benefits.

### (3) *Formulation of a Rule of Federal Common Law*

■ Interpretation of the legal status and enforceability of plaintiffs' medical insurance plan is governed by principles of federal common law. As this Court held in *Adcock*, although welfare benefit plans are not subject to the vesting and participation provisions of ERISA, an employee nevertheless may acquire a contractual interest in such benefits, enforceable under federal common law. *Adcock*, at 415. "Congress intended that a body of Federal substantive law ... be developed by the Court to deal with issues involving rights and obligations under private welfare and pension plans."

120 Cong.Rec. 29942 (1974) (remarks of Senator Javits). *See Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* —— U.S. ——, 105 S.Ct. 2833, 2840–41, 86 L.Ed.2d 447 (1985). In a concurring opinion to the decision in *Massachusetts Mutual Life Insurance Company v. Russell,* —— U.S. ——, 105 S.Ct. 3085, 3098, n. 18, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring), Justice Brennan noted:

> "Where the courts are required themselves to fashion a federal rule of decision, the source of that law must be federal and uniform. Yet, state law where compatible with national policy may be resorted to and adopted as a federal rule of decision.... Here, of course, there is little federal law to which the court may turn for guidance. State regulation of insurance, pensions, and other such programs, however, provides a preexisting source of experience and experiment in an area in which there is, as yet, only federal inexperience.... State statutory sources of law will no doubt play a major role in the development of a federal common law under ERISA, particularly in defining rights under employee benefit plans." *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 426 F.Supp. 316, 325 (N.D.Ind.), *modified on other grounds,* 567 F.2d 692 (7th Cir.1977).

**9.** And while active employees undoubtedly will be displeased with a doubling of their medical insurance premiums, they nevertheless are in a position to bargain with their employer to maintain current premiums. When the employer's action is deemed too drastic and the employer is unresponsive to employee protests, ultimately employees will leave. That another worker may step in at the lower benefit is immaterial—for that event is a "healthy" result of the principles of supply and demand in a competitive market—the paramount factor is that the active employer/employee relationship permits bargained for exchange. In the employer/retiree context, the retiree has no leverage (with the exception of ancillary effects on the employer's public image and active employee morale), hence arm's length negotiation frequently may not occur.

**10.** American General's recognition of the retiree's lack of bargaining leverage is represented in the manner in which it approached the January 1, 1984, amendments. The corporation sent out fifteen to twenty teams to make nationwide presentations to *active* former NLT/NLA employees concerning the merger of the NLT Security Program into American General's. No retirees were invited; some were discouraged from attending. American General was concerned with maintaining the good will and services of the active employees, but, as to the retirees, this group had little to offer, hence unilateral changes made on a "take it or leave it" basis posed no prospect of substantial loss to the company. The presentations made to active employees take on the appearance of a bargained-for exchange. The unilateral amendments to the retiree's benefits do not; they reflect overreaching.

■ The Court looks to the state common law of contracts as guidance in formulating a sound federal common law rule with which to analyze the rights and obligations of the parties. In *In re White Farm Equipment Co.*, 42 B.R. 1005 (Bankr.N.D.Ohio 1984), *expedited appeal granted* (April 15, 1985), *suggestion of bankruptcy filed staying appeal* (June 24, 1985), Judge Aldrich decided a case remarkably close on point to the issues pending in this matter.[11] Retirees of the corporation had commenced the action under the Bankruptcy Act seeking retroactive reinstatement of welfare benefits, including health, life and welfare insurance, following termination of the benefits by a successor corporation to the retiree's former employer. The Bankruptcy Court had entered summary judgment in favor of the employer, finding that Congress had expressly excluded welfare benefit rights from the vesting and participation standards of ERISA, 29 U.S.C. § 1051, and therefore excluded such benefits from the concept of "accrued benefits," 26 C.F.R. § 1103(1)(2), thereby permitting the corporation's unilateral termination of the retiree's rights. In reversing the Bankruptcy Court, Judge Aldrich stated that "nothing in ERISA indicates that Congress intended to make contracts unenforceable," 5 EBC at 2139. The district court proceeded to consider Ohio law as well as that of other states in defining employee benefit rights. The court concluded that:

> an employer may not invoke a termination clause to cut off the benefits of a former employee who has properly retired pursuant to the employer's requirements....

■ This Court agrees with the analysis in the *White Farm Equipment* case, that is, that the legal status of the benefits should be construed consistent with ERISA's policy and state contract law concerning (1) unilateral contracts and concepts of substantial performance and bargained for exchange, and (2) determination of the in-

tent of the parties to resolve conflicting and ambiguous terms contained in plan documents. *See United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256, 259 (6th Cir.1985).

The creation of a binding contract requires an offer and acceptance, both of which are supported by adequate consideration. Similarly, the modification of a contract requires a bargained-for exchange supported by consideration. In *Simmons v. Hitt*, 546 S.W.2d 587, 592 (Tenn.App. 1976), the Tennessee Court of Appeals held that unfunded pension and retirement plans are not merely gratuities offered by the employer, but created legal rights upon the employees' notice that such benefits are being offered and the employees' performance of the terms necessary for acceptance. The *Simmons* court stated:

> We hold a non-contributing pension plan is not a gratuity. It is an offer of additional deferred compensation to the employee as an incentive toward continuing better service and loyalty; the offer is accepted by the employee remaining in the employment of the employer, which is sufficient consideration to support the employer's promise to pay the benefits and is therefore a contract enforceable by the employee.

*Id.* at 592, *quoting Johnson v. Mueller Co.* (1974) (Matherne, J., unreported). In this case, NLT/NLA management consistently promoted its Security Program as a form of deferred compensation in consideration of present service with the company which, although yielding no present monetary benefit, would ultimately guarantee financial security during retirement.

In defining the rights of the parties, the Court first will consider the explicit language contained in plan documents. *International Union v. Yard-Man, Inc.*, 716 F.2d 1476, 1479–80 (6th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) (interpreting the terms

---

**11.** Defendants concede that if the holding in *White Farm Equipment* is "good law," then this Court must find in favor of the plaintiffs. Defendants ask the Court to review carefully the analysis of the case and refuse to follow its holding. This Court views *White Farm Equipment* as "good law."

of a collective bargaining agreement under the Labor Management Relations Act).

The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.... Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather the interpretation rendered not denigrate or contradict basic principles of federal labor law.

*Id.* at 1479–80. (citations omitted). The termination/modification clause contained in the NLT/NLA summary plan descriptions clearly and expressly reserve the right to amend and terminate the medical insurance benefit plan. At the same time, however, the plan descriptions also promise to continue the plans after the plaintiffs' retire, without further cost to the retiree. The Court cannot read both provisions together without reaching the conclusion that the provisions conflict and require interpretation of what the parties mutually intended by placing the terms in the agreement. As stated in *Yard-Man*, the agreement's terms must be construed to avoid nugatory and illusory promises. To read the plan as providing lifetime paid up medical insurance and, at the same time, reserving the right to terminate the benefits at any time constitutes an illusory promise—an express, unqualified grant of a right negated by an express unqualified reservation of the right to terminate the grant.

The Court does not believe that the promise of medical insurance benefits is a mere gratuity, but rather a legal right derived from a unilateral contract. The plaintiffs in this case were promised that if they became employees and if they stayed with the company until retirement, they would enjoy the peace of mind and security provided under the Security Program, including paid up medical insurance. At the time the promises were made, both parties had relatively equal bargaining power. The corporation offered a set of benefits, including both present and deferred compensation, and the employee offered the promise of quality service in return. As an employee rendered services, he earned present salary and commissions, as well as deferred compensation in the form of pension and welfare benefits. Retirement following years of service culminates in the discharge of the employee's duty under the contract, having fully performed his end of the agreement. Upon retirement the bilateral bargaining position of the parties ceased. The employee was now entitled to receive those earned benefits deferred until retirement. Deferred retirement benefits earned during active employment are enforceable contract rights. In *Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4 (1st Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979), the court cites authorities in more than ten jurisdictions for the proposition that "a unilateral offer of deferred earnings becomes irrevocable upon an employee's rendering of many years of faithful service and reaching retirement." *Id.* at 4–5, (quoting *Rochester Corp. v. Rochester*, 450 F.2d 118, 120–21 (4th Cir. 1971)).

Even though the employer has reserved the right to amend or terminate the plan, once an employee, who accepted employment under such a plan, has complied with all the conditions entitling him to participate in such a plan, his rights become vested and the employer cannot divest the employee of his rights thereunder.

*Hoefel*, at 5–6. This reasoning also was followed in *In re Erie Lackawanna Rail-*

*way Company*, 548 F.2d 621, 625–27 (6th Cir.1977), in which the court prohibited the enforcement of a termination clause contained in a life insurance plan, reasoning that operation of the clause would work a forfeiture without good and sufficient cause.

> [U]nder our economic system, an employer cannot offer a retirement system as an inducement to employment and, after an employee has accepted employment under such conditions, withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder.

*Id.* at 627. The termination clause in *Erie Lackawanna* provided: "The Company reserves the right to terminate the plan." Notwithstanding the unqualified provision, the court refused to give it effect—first looking to contract law to find an implied term requiring each party to discharge their duty to perform in good faith, and then looking to equity for the proposition that equity abhors a forfeiture. *Id.* at 627.

> This principle is particularly well settled in the law of insurance; and of course it must also be remembered that it is one of the best-known principles of insurance law that a policy or contract of insurance is to be construed liberally in favor of the insured or his beneficiary, and strictly construed against the insurer.

*Id.* at 627. (citations omitted). There must be some form of mutuality of obligation and exchange of consideration to warrant amendment of retirement benefits. Without a showing of "good and sufficient cause," an employer may not unilaterally make such an amendment. *Id.*

 The termination/modification clause in this case is not unenforceable and void as a matter of public policy. Rather, American General may not seek its operation unless, as the provision is worded in the summary plan descriptions, such a change is "necessary." The Court interprets the requirement of necessity to demand a good faith, sufficiently compelling financial reason to amend the level of benefits promised over the period of employment and on which employees have justifi-

ably relied. "It would be unjust and inequitable, following this justifiable reliance ... to permit any tampering, statutorily or otherwise, with their pension benefits." *Miles v. Tennessee Consolidated Retirement System*, 548 S.W.2d 299, 305 (Tenn. 1976) (invaliding Tennessee statute modifying the pension plan of the Tennessee judiciary). In *Miles*, the Supreme Court of Tennessee stated that the legislature could not statutorily amend the provisions of the judicial pension plan absent "a vital interest of the state." *Id.* at 305. Similarly, in this case, American General must demonstrate, not that the costs of the medical insurance plan far outweigh the insurance premiums paid by retirees, but rather that the contractual promises previously made are now avoidable because of some unforeseen contingency that threatens the financial base of the entire corporation. In light of American General's earnings during the first half of this year, the Court does not view the alleged incremental cost attributable to the retirees' medical insurance plan to constitute sufficient cause to warrant amendment of the plan.

 Finally, ERISA expressly requires that termination procedures be set forth in the plan documents. 29 U.S.C. § 1102(b). The purpose of this requirement is to inform beneficiaries and participants of the process by which their level of benefits may be affected and, also, to hold trustees to strict standards of fiduciary responsibility in implementing such amendments. In this case, both NLT and American General's summary plan descriptions contain no procedures concerning termination. The procedural violation does not render the particular clauses unenforceable, rather, this Court will require a showing of at least good faith and cause prior to their invocation.

The defendants argue that for this Court to hold for the plaintiffs will result in a chilling effect on employers' likelihood of offering welfare benefit plans. The Court believes, however, that an employer must take a more realistic approach to the promises he makes in seeking to solicit and

retain quality employees and not to promise more than he is willing to pay.

d) *American General's Role as Fiduciary For the Retiree Benefit Plan.*

 (1) *American General's Fiduciary Duties*

██ American General's role as a fiduciary of the retiree benefit plans is distinct from its role as the successor to the retiree's former employer, National Life and NLT. Under Part 4 of ERISA, 29 U.S.C. § 1101–14, standards of fiduciary conduct are imposed upon the administrator of employee benefit plans. Unlike the common law prohibition against dual loyalties, Congress permits the fiduciary of benefit plans to assume multiple obligations. *Donovan v. Bierwirth,* 538 F.Supp. 463, 468 (E.D.N.Y.1981), *modified on other grounds,* 680 F.2d 263 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (holding that the use of fund assets to fend off a hostile tender offer, since made without sufficient inquiry into the facts, constitutes a violation of the fiduciary standards under ERISA).

Recognizing the potential conflicts of interest that might arise when a corporation serves both as the employer and the fiduciary, Congress has carefully delineated the fiduciary duties upon the corporation as fiduciary of employee benefit plans.

... [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

 (A) for the exclusive purpose of:

 (i) providing benefits to participants and beneficiaries; and

 (ii) deferring reasonable expenses of administering the plan;

 (B) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

 (C) By diversifying the investments of the plan so as to minimize the risks of large losses, unless under the circumstances it is clearly prudent not to do so; and

 (D) In accordance with documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

29 U.S.C.A. § 1104 (1984 Supp.). Assets of an employee benefit plan generally are required to be held in trust for the benefit of plan participants and/or beneficiaries. 29 U.S.C. § 1103(a). However, as is the situation in this particular case, assets which consist of insurance contracts or policies, or which constitute the assets of an insurance company are expressly excepted from the requirements that such assets he held in trust. 29 U.S.C. § 1103(b). However, regardless of whether assets are held in trust, a fiduciary is charged with strict standards of care in the administration and management of plan assets. The fiduciary must manage those assets solely in the interests of plan participants and beneficiaries.

During the presentation of evidence in this case, defendants called Mr. Donald S. Grubbs, Jr., as a witness. (*See* Exhibit 45 (Expert. Witness Statement)). Mr. Grubbs is a leading authority on ERISA. During congressional investigation leading up to the enactment of ERISA, Mr. Grubbs was commissioned by the Senate Subcommittee on Labor to prepare a report on the costs of mandatory vesting provisions. A summary of the report appears in an appendix to the report of the Senate Committee on Labor and Public Welfare. S.Rep. No. 93–127, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4838, 4884–4889. During Mr. Grubbs' testimony, the witness stated that the fiduciary standards expressed under ERISA are not applicable to the administrator of a welfare benefit plan to the extent that there are no assets expressly set aside to fund the particular plan. That is, to the extent that a corporation merely holds general assets to pay for a particular plan—in this case the medical insurance benefits—no fiduciary standards of care regulate the administra-

tor's conduct. The Senate Report to which Mr. Grubbs' report is an appendix states:

The fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts.

\* \* \* \* \* \*

Section 15(a) when read in connection with the definition of the term "employee benefit fund" makes it clear that the fiduciary provisions apply only to those funds which leave assets at risk. While the Retirement Income Security for Employees Act has the effect of requiring all retirement plans subject to that Act to be financed through the medium of a segregated fund, there may be welfare funds subject to the Welfare and Pension Plans Disclosure Act such as those providing sickness or disability benefits, which may not be funded. Thus, an unfunded plan in which the only assets from which benefits are paid are the general assets of the employer is not covered.

*Id.* at 4865–4866.

■ Plaintiffs introduced into evidence copies of the medical insurance plans provided under the NLT/NLA Security Program. (*See e.g.,* Exhibit 5, 37, 38). The Court views the master policy issued by NLT/NLA, as the insurance carrier of such plans, to be held by American General in its fiduciary capacity as the administrator of the welfare benefit plan for the retirees. Stated another way, NLT/NLA, as the employer, promised a certain level of medical insurance benefits. Pursuant to the promise, the employer made arrangements to purchase from itself insurance policies to carry out its promise. Once purchased, the master policies were held by NLT/NLA (and now by American General) as an administrator of the welfare benefit plans. Under ERISA's fiduciary standards, American General holds and must administer the insurance policies solely in the interest of the retirees.

A trust is not to be required in the case of plan assets which consist of insurance (including annuity) contracts or policies issued by an insurance company

qualified to do business in a State (or the District of Columbia).... Although these contracts need not be held in trust, [29 U.S.C. § 1103(b) ], nevertheless the person who holds the contract is to be a fiduciary and is to act in accordance with the fiduciary rules of the substitute [bill] with respect to these contracts. For example, this person is to prudently take and keep exclusive control of the contracts, and is to use prudent care and skill to preserve this property.

To the extent that plan assets are held by an insurance company they need not be held in trust. However, to the extent the substitute [bill] treats assets held by an insurance company as "plan assets", the insurance company is to be treated as a fiduciary with respect to the plan, and is to meet the fiduciary standards of the conference substitute.

H.R.Conf.Rep. No. 93–1280, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5079. Plaintiffs introduced NLA's 1983 Form 5500 filed with the IRS reporting the annual return on the group medical, life, and AD & D policy. Schedule A, Item 9(d) reports $42,263,925 as policyholder reserves held to provide benefits after retirement. At this point in the proceeding, it is not clear whether this amount constitutes a dedicated asset to fund the medical insurance plan or merely represents a line item for tax purposes only, constituting a nondedicated portion of the corporation's general assets. In light of the statutory provisions and legislative history discussed above, to the extent the amount represents a dedicated asset, American General, as the administrator of the medical insurance plan would be subject to the fiduciary provisions under ERISA. While ERISA does not require mandatory funding of welfare benefit plans, 29 U.S.C. § 1081(a)(1), ERISA does not prohibit an employer from funding such a plan. Whether NLT/NLA opted to fund its medical insurance plan presents a question of fact for adjudication.

Regardless of the resolution of this particular issue, the Court finds that the plaintiffs have a substantial likelihood of suc-

cess on the proposition that American General was subject to a fiduciary duty with respect to holding and protecting the issued insurance policy covering the medical insurance plan.

(2) *American General Had a Duty to Assure the Continuation of Funding Required Under the Employment Contract Between Plaintiff Retirees and NLT/NLA.*

■■■ The Court has discussed the federal common law contractual principles on which the retiree's may proceed under ERISA in seeking to procure American General's continued funding of the medical insurance plans. As the fiduciary of the plan, American General has a duty to insist that the plan be funded "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). The plaintiffs have demonstrated that the documents and instruments require American General as "employer" to continue to fund paid up benefits at pre-January 1, 1984, levels; American General, as fiduciary, has the statutory obligation to assure that American General, as employer, discharges that funding obligation.[12]

(3) *The Incorporation of an Escape Clause Providing for the Termination of Medical Insurance Should a Retiree be Covered by Another Employer's Insurance Constitutes Arbitrary and Capricious Conduct.*

■■■ Courts extend great deference to the administrator of a welfare benefit plan and will not vacate an administrator's decision unless such action is shown to be arbitrary and capricious, or made in bad faith. *Jung v. FMC Corp.*, 755 F.2d 708 (9th Cir.1985). American General's regulation requiring the termination of a retiree's medical insurance in the event that he is covered by another employer's medical in-

surance policy constitutes arbitrary and capricious conduct in violation of the fiduciary standards imposed under ERISA. In *Northeast Department ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147 (3d Cir.1985), the court concluded that an escape clause requiring automatic forfeiture of medical insurance was unenforceable by virtue of ERISA's fiduciary standards, because the provision took into account no consideration of the relative comparability of the other insurance coverage. In *ILGWU*, a union employee had retained benefit rights under two medical insurance plans. Following an operation, the employee made a claim with one multiemployer plan who denied coverage because of her coverage under another plan. The employee then sought reimbursement from the other plan which also had an escape clause and denied coverage. The employee filed suit. The district court found in favor of the employee and ordered an award, retaining jurisdiction over the two plans to determine contribution. In declaring the escape clauses void per se, the court observed

[O]ne very important policy underlying ERISA is that employees enrolled in a benefit plan should not be deprived of compensation that they reasonably anticipate under the plan's purported coverage. Escape clauses, however, risk just such a result. An escape clause ... does not contain any requirement that the coverage provided by the other plan be comparable to the coverage provided in the escaping plan before the latter plan will defer liability. In addition, unlike plans with excess clauses, a plan with an escape clause does not provide participants who receive less in benefits from the other plan with the opportunity to return to the first plan for the difference. As a result, a participant of a plan with an

---

12. Finally, to the extent that plaintiffs can demonstrate at a full trial on the merits that the $42,000,000 appearing on the Form 5500 constitutes a dedicated asset to the medical insurance benefit fund, another issue exists as to the present status of that fund and whether it continues to remain at its prior level. Under ERISA, "the assets of a plan shall never inure to the

benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries in defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). This issue was not sufficiently examined at the hearing on the preliminary injunction.

escape clause, who thinks that he is covered by that plan and who expects to recover medical expenses in accordance with the terms of that plan, automatically loses this coverage in the presence of another insurance plan, even if the benefits he is entitled to receive under the other plan are much less favorable than those of his own. In our view, trustees who incorporate in a plan a provision that has the potential to harm participants in this way have indeed acted in an arbitrary and capricious manner. Accordingly, we hold that the escape clauses in ERISA covered employee benefit plans are unenforceable as a matter of law.

*Id.* at 163–64. As administrator of the medical insurance plan, American General has the duty to act solely in the interests of the retiree beneficiaries. At the hearing, defendants put on no evidence to demonstrate the benefit to be gained by the retirees through enforcement of such a provision. The Court cannot determine that any exists. The clause discourages a retiree from seeking alternate employment because of the threat of losing one's medical insurance permanently, regardless of the level of other insurance or the duration of the other employment opportunity. The escape clause is anticompetitive, and constitutes a breach of American General's fiduciary duty; it is unenforceable as a matter of law.

(4) *The Requirement of Immediate Election for Spousal Survivor Benefits Constitutes Arbitrary and Capricious Conduct.*

 Unlike medical insurance benefits, spousal survivor benefits constitute a form of pension benefit and are therefore covered by the comprehensive vesting and participation provisions and the funding provisions under ERISA. 29 U.S.C. § 1055. The plaintiffs in this case may accrue vested rights to such benefits. Under the terms of the Security Program, retirees who left active employment with NLT/NLA prior to age 65 were given a window period during they could decide whether to elect to enter the spousal survivor program. The election was not re-

quired to be made until age 65. Those retirees opting for the survivor benefits were required to commence contributions, which were deducted from the monthly annuity to which the retiree was entitled. As of July 1, 1984, all NLT/NLA employees who had continued on with American General following the merger, but who had retired after January 1, 1984, were required to immediately elect to join the spousal survivor benefit program and make contributions. Under the NLT/NLA Security Program, these retirees could have waited until age 65 to take the option and to avoid contributions until that time. American General ended the practice. At the hearing, American General made no response to what the plaintiffs termed arbitrary and capricious conduct. Like the escape clause to the medical insurance benefits, this Court can conceive of no basis on which the elimination of the window period for election constitutes action made solely in the interest of the beneficiary. Although the elimination would seem to have the prospect of generating additional revenues for American General, the elimination does not appear to benefit the beneficiaries. Hence, the elimination constitutes arbitrary and capricious conduct in violation of American General's fiduciary duties.

2. *Plaintiffs have Demonstrated the Prospects of Irreparable Harm.*

The second finding this district court must make prior to the issuance of a preliminary injunction is the finding that the plaintiffs have demonstrated the likelihood of irreparable harm absent a preliminary injunction. *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100 (6th Cir.1982); *Advisory Information & Management Systems, Inc. v. Prime Computer, Inc.,* 598 F.Supp. 76 (M.D.Tenn. 1984). The plaintiffs in this case are retirees, most of whom are on fixed incomes. The prospect of doubling the present medical insurance premiums—and going from no premium prior to January 1, 1984—threatens the class both with monetary hardship and emotional anguish.

Ordinarily, to the extent an alleged harm is redressable by a retroactive award of monetary damages, there is little prospect of irreparable harm. In this case, however, the Court is faced with an unusual class of plaintiffs. Defendants stated that of a class of approximately 2,500 persons, four to five individuals die each month. Assuming this case follows the normal course of appeals (and possible remands) seen in many complex cases, a final resolution of this case may not be achieved for three to four years. Ten percent of the class may have died during this period. Assuming the plaintiffs prevail, the retroactive award of monetary damages to these decedents' estates would not be sufficient to compensate the individuals for their loss.

More importantly, the Court is sensitive to the mental anguish suffered by many members of the class faced with the prospective increase in their medical insurance premiums. As individuals who have dedicated their life service to their employer, it is understandable that many would be frustrated by a reduction in the benefits they had been promised during their active employment years. Although American General characterizes the economic hardship on these individuals as merely $30.00 per month, the increase in premiums imposes an opportunity cost requiring the beneficiaries to forego other activities, perhaps necessities, which they would spend their monies on during their retirement years. Moreover, the retirees lose the intangible, yet very real sense of security that accompanies the knowledge that one has a reliable source of income to count on. If American General can modify the plan at will, the retirees have no assurance as to the future level of benefits, the premiums, or the deductible they must meet.

The enforcement of the "other income" escape clause imposes irreparable harm. If the insurance offered by the other employer ceased for some reason, the American General insurance would not be reinstated, leaving the plaintiff without any medical insurance whatsoever. This Court concurs in the holding of the district court in *UAW Local 107 v. White Farm Equip-*

*ment Co.*, 5 Employees Benefit Cases [BNA] 2449, 2453 (D.Minn. Oct. 19, 1984).

The loss of health insurance benefits and the possibility that retirees will be forced to pay for insurance coverage with dollars previously committed to some other necessity of life satisfies the movants' burden to establish a threat of irreparable harm.

The Court is satisfied that the plaintiffs have made such a showing in this case.

3. *Issuance of a Preliminary Injunction Serves the Public Interest.*

The principal policy objective of ERISA is to secure employee's retirement income. In this way, individuals can rely on private sources of financial support during their retirement years and, therefore, will not have to rely on public subsidy. The reduction of reasonably anticipated levels of retirement benefits threatens to make those who have carefully planned for their retirement reliant on other sources of income. As between public financing and financing by American General, in light of the Court's discussion of the plaintiffs' likelihood of success on the merits, the Court concludes that American General should be required to continue to honor the promises made by NLA/NLT to finance the medical insurance plan.

The escape clause for other insurance is anticompetitive in the sense that it discourages a retiree from seeking other employment after he retires. The escape clause may be compared to a covenant not to compete, which generally are void as against public policy unless shown to serve a rational purpose limited in time and space. *See Koehler v. Cummings*, 380 F.Supp. 1294, 1308 (M.D.Tenn.1971).

Finally, the United States, like other civilized societies, has a paramount interest in protecting the health and welfare of its elderly. While recognizing that a genuine issue exists, the Court nevertheless determines that as between the retirees and American General, the public interest lies with the retirees in protecting their limited income from the possibly arbitrary and ca-

pricious diminution by the proposed changes of American General.

#### 4. *Harm to Others.*

The issuance of the preliminary injunction, if improvidently granted, threatens only temporary monetary losses to American General. Having earned record profits during the first half of 1985, the incremental monetary costs placed upon American General will not threaten its financial solvency. While defendants argue that the issuance of a preliminary injunction will make other employers in the private sector reluctant to offer medical insurance to their employees following retirement, this Court finds that effect of the injunction may make employers more careful about the representations they make concerning post-employment benefits and more likely to carefully assess the financial commitment they are willing to make concerning such benefit plans.

#### 5. *Security*

The Court has the authority to require the plaintiffs to post adequate security prior to the issuance of this preliminary injunction. Fed.R.Civ.P. 65. Upon this Court's issuance of a temporary restraining order, American General waived its right to security. Because the Court is uncertain as to American General's position on security regarding a preliminary injunction, the Court will reserve the question of security and will permit the defendant ten days from the receipt of this order to respond to plaintiffs' request that security not be ordered in this matter.